Breitel, J.
These are two proceedings. One is by the SpenceChapin Adoption Service, to recover the custody of a three-year-old child from the Polks, foster care “ custodians ” to whom the agency had delivered the child for compensated foster care to be returned on demand. The other is by the unwed mother of the child to regain custody. Neither proceeding is an adoption proceeding and the child has never been placed for adoption. Nor has any authorized person or agency brought any proceeding to establish the unfitness of the mother to retain custody of her own child, nor has there been any proof of unfitness, albeit there have been findings of inadequate plans by the mother to care for the child. The Polks resist the proceedings and assert some inchoate right to custody and eventual adoption contending that the mother is incapable of providing adequate care for the child. While there had been a statutory written surrender of the child’s custody looking to adoption, the New York City Commissioner of Social Services consented to the return of the custody of the child to the mother, a consent joined in by the agency, thus nullifying the surrender as if it had never been. These salient circumstances distinguish this case from others in which a child has been surrendered and the surrendering parent has sought judicial assistance in undoing the surrender (cf. People ex rel. Scarpetta v. Spence-Chapin Adoption Serv., 28 N Y 2d 185) or where prospective adoptive parents have had custody looking to adoption and have sought to retain the child against the wishes of a mother who has changed her mind (e.g., People ex rel. Anonymous v. New York Foundling Hosp., 17 A D 2d 122, affd. 12 N Y 2d 863).
Thus the issue is not, as the Polks would have it, whether one choice of custody or another is better for the child, or, put another way, whether the Polks would raise the child better than would the unwed mother, or which cultural or family background would be best for the child. "Least of all is the issue that of comparing the quality and depth of love and affection between the child and those who would compete for its custody. Nor is the issue whether natural parents or adoptive parents make “ better ” parents, whatever that may mean. The power *199 of the State, let alone its courts, is much narrower. Child and parent are entitled to be together, unless compelling reason stemming from dire circumstances or gross misconduct forbid it in the paramount interest of the child, or there is abandonment or surrender by the parent. A baby born out-of-wedlock, even of a troubled mother, is not no-one’s child. In the inimitable vernacular, it is not “ up for grabs ”. It is not a waif claimable by the first finder, however highly qualified.
The Family Court misconceived the nature of the proceedings and considered itself free to determine conscientiously in whose custody the child would fare best, the foster care custodians, the natural mother, or some future adoptive couple of Chinese extraction. The Appellate Division correctly determined that the court was without power, absent abandonment of the child, statutory surrender outstanding, or the established unfitness of the mother, to deprive the mother of custody. Since none of these factors was present the natural mother was entitled to obtain the custody of her child, and the child was entitled to be returned to its mother. It so directed, and the order should be affirmed.
On June 13, 1968 the mother bore the child, a little girl, out of wedlock. She was then 19 years of age, a native of China who had come to this country with her family in 1963. The father of the child was also of Chinese extraction, married, with four children of the marriage. She concealed the illegitimate birth from her parents and siblings, except one married sister. All are of the lower economic level from Manhattan’s ‘‘ Chinatown ’ ’. Because of the complications in her own family and in that of her paramour, she gave the child to the New York City Commissioner of Social Services for temporary care but not for adoption. Five months later the Spence-Chapin agency, having received the child from the Commissioner, placed it with the Polks for foster care, as it had previously done with some 16 (or 18) other children, to be returned on demand, as the Polks had faithfully done with other children entrusted to them by the agency. While the child was with the city nursery the mother visited the child biweekly, and while it was with the Polks on Long Island once a month, with inconsequential exceptions. It is evident that she sought to maintain her relationship with the child despite the obvious hurdles, and from time to time made *200 plans which she discussed with the agency. None of these plans was desirable and on the agency’s advice none was essayed.
In March, 1970, as the child approached two years of age, the agency insisted that a permanent arrangement be made. It finally convinced the mother on May 12,1970 to execute a written surrender of the child and authorize adoption by adoptive parents, pursuant to section 384 of the Social Services Law. She orally conditioned her agreement that the child be placed with adoptive parents of Chinese extraction. The fact of the oral condition is undisputed.
At this point the Polks, who had formed a deep attachment for the child, were encouraged, they say, to believe they could keep the child. Indiscreet or misunderstood remarks were made to Mrs. Polk by a novice caseworker that they would be eligible to or could adopt the child. After obtaining the surrender, the agency had some initial difficulty, soon resolved, in finding adoptive parents of Chinese extraction. In any event, it was shortly after the surrender that the agency demanded the return of the child. The Polks, in breach of their obligation, refused, and instead demand the right to adopt the child.
In the meantime, the mother concerned about what was happening to her child, learned from the agency that no placement for adoption had taken place, that the Polks were illegally retaining the child and asserting a right to adopt it. She then, on September 30,1970, demanded the return of the child. The Commissioner of Social Services, joined in by the agency, consented to the return of the custody, as permitted by the statute (Social Services Law, § 383, subd. 1). Then ensued these proceedings, during which, at one point, the Polks removed themselves and the child from the State in order to be beyond the jurisdiction of its courts.
On the day of the argument of this appeal the Commissioner of Social Services addressed a letter to the Polk lawyer purporting to have changed his mind and stating that he is ready to consent to the adoption of the child by the Polks. Apart from the doubtful judgment of making such an abrupt ex parte communication while the case is sub judice, and the obligation of the court to determine issues on the record made, the letter has no effect. Once the surrender had been nullified by the consent to *201 return custody to the mother, only by a new surrender, or a judicial undoing of the consent, could the mother be deprived of the custody of her child. As noted earlier, there is no adoption proceeding pending, and, as observed later, there is unlikely to be one unless the mother consents.
These are the nub facts of the case. There is much more about religious and racial differences between the Polks and the child, and whether a “ Chinatown ” background of the mother and her immediate family was appropriate for a child now exposed for three years to an occidental and suburban culture. There is also much about the love and affection the Polks have for the child and the child for them, and about the inadequate or undesirable plans the mother has had for raising the child. All of these factors would be material, perhaps, if the State had the power to wrest a child from its mother in the absence of abandonment, outstanding formal surrender, or demonstrated unfitness as distinguished from what others might regard as inadequate plans for its upbringing. It has no such power, nor should it have.
There has been no serious effort to assert, let alone establish, abandonment of the child. There has been, it is true, assertion of unfitness, but the problems the mother has are no greater nor different than for other young unmarried mothers, further complicated by her particular circumstances. There is a chasm between unfitness for parenthood and what is only troubled parenthood, or poverty, or difficulty in resolving plans for a child’s upbringing. Even if she has not lived wisely, the mother loves and is concerned for her child, even as the Polks have demonstrated by their extraordinary bre? sh of trust and illegal actions, that they too care for the child.
Only the one-time delivery and surrender of the child by the mother stands as an arguable issue in the case. The statute is explicit, however. It provides: "The parent of a child remanded or committed to an authorized agency shall not be entitled to the custody thereof, except upon the consent of the court, public board, commission, or official responsible for the commitment of such child, or in pursuance of an order of a court or judicial officer of competent jurisdiction, determining that the interest of such child will be promoted thereby and that such parent is fit, competent and able to duly maintain, support, and educate *202 such child.” (Social Services Law, § 383, subd. 1.) In this case the child had been committed to the New York City Commissioner of Social Services. Upon his consent, which he gave, the mother became entitled to the untrammeled custody of the child. That is the end of it. Incidentally, insofar as the Polks are concerned, subdivision 2 of the same statute makes clear that as foster care “ custodians ” they never had true custody. ■ That custody was in the Spence-Chapin agency by delegation from the Commissioner of Social Services. Of course, had the Commissioner or the agency refused to consent to the return of the child to the mother, the case would be different, and the mother would have had the burden of undoing her surrender as in People ex rel. Scarpetta v. Spence-Chapin Adoption Serv., 28 N Y 2d 185, supra. But even on a superficial examination it is apparent that there was a reasonable basis for the Commissioner’s act in consenting and that act is therefore beyond further review by the courts, assuming for this purpose that the Commissioner’s act is at all reviewable (cf. Matter of Jewish Child Care Assn. [Sanders], 5 N Y 2d 222, 228, infra).
As noted earlier, irrelevant are cases concerned with the undoing of a surrender by the mother (e.g., People ex rel. Scarpetta v. Spence-Chapin Adoption Serv., supra, based on invulnerable affirmed findings of fact beyond review by this court, but restating the applicable law and principles governing a child found to have been improvidently surrendered for adoption to proposed adoptive parents). One reported case in this State concerned with foster care custodians who became too attached to the child is Matter of Jewish Child Care Assn. (Sanders) ¿ (supra). There are parallel facts. A child was born out-of-wedlock and placed in foster care while the mother made the painful struggle to effect a suitable arrangement for its upbringing. By the time arrangements were ready, the foster care custodians rebelled against yielding up the child, as did the Polks, ‘ ‘ contrary to their own agreement and in violation of their trust.” (id., at p. 228). The court sustained the right of the mother to her child and of the child to be with its mother. It said, through the late Chief Judge Conway: “ The nature of this case requires one further basic statement. What is essentially at stake here is the parental custodial right. Although Child *203 Care has the present legal right to custody (Social Welfare Law, § 383, subd. 2) it stands, as against the Sanders, in a representative capacity as the protector of Laura’s mother’s inchoate custodial right and the parent-child relationship which is to become complete in the future. Any future physical legal custody in Laura’s mother would be but an empty right, if the emotional substance of that relationship were permitted to be replaced antecedently by the parent-like love and possessiveness of Mr. and Mrs. Sanders. This court has acknowledged that ‘ * * * the right of a parent, under natural law, to establish a home and bring up children is a fundamental one * * *.’ (People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542, supra.) In support of this tenet we have declared that ‘ Except where a non-parent has obtained legal and permanent custody of a child by adoption, guardianship, or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s welfare compels awarding its custody to the nonparent. ’ (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469, supra.) A proper application of these doctrines requires the conclusion that foster parents may not succeed in a proceeding such as this, where the child temporarily in their care is to return to its natural parent, in accordance with the trust accepted by the foster parents for compensation, in the absence of a clear showing that to return the child to the boarding agency will operate to its grave detriment. The paramount parental right to raise one’s own child, which we regard as fundamental, is to be protected not only from directed and immediate incursion, as in the Shepsky and Strasser cases, but also from indirect and less proximate subversion, such as in the case before us.” (5 N Y 2d 222, 229-230).
People ex rel. Kropp v. Shepsky (305 N. Y. 465), cited in the Sanders case, although it involved a surrender set aside, or perhaps, a fortiori, because it did, restated the fundamental principles that an unwed mother has a parental right and duty to custody, and that primacy of parental rights may not be ignored. Thus Chief Judge Fuld stated on behalf of the court: ‘‘ Apart, however, from such special and weighty circumstances, the primacy of parental rights may not be ignored. In no case may a contest between parent and nonparent resolve itself into ‘ a *204 simple factual issue as to which [affords] the better surroundings, or as to which party is better equipped to raise the child.’ (People ex rel. Portnoy v. Strasser, supra, 303 N. Y. 539, 542.) And that is true even if the nonparent initially acquired custody of the child with the parent’s consent. (See, e.g., People ex rel. Beaudoin v. Beaudoin, supra, 126 App. Div. 505, 507, affd. 193 N. Y. 611; cf. Matter of Bistany, 239 N. Y. 19.) ” (305 N. Y. 465, 469) and further: “ In other words, the burden rests, not, for instance, upon the mother to show that the child’s welfare would be advanced by being returned to her, but rather upon the non-parents to prove that the mother is unfit to have her child and that the latter’s well-being requires its separation from its mother.” (305 N. Y. at 469). Of course, this does not mean the child’s rights and interests are subordinated. The principle rests on the generally accepted view that a child’s best interest is that it be raised by its parent unless the parent is disqualified by gross misconduct. That the generalization has myriads of exceptions is equally true, but the exceptions do not contradict the verity of the principle.
What has been discussed thus far are not merely legal principles. They are legal principles, to be sure, but they also reflect considered social judgments in this society respecting the family and parenthood, or else they could not survive as legal principles.
But it is of merit to refer to some pragmatic circumstances. Before the present contretemps, the Polks had been used by the agency in some 16 foster care assignments. They were good at these compensated assignments, and undoubtedly the agency in choosing them made the investigations and the determinations of their qualification for foster care. It is obvious that the investigations and judgments required to select adoptive parents are of a different order (but see Social Services Law, § 383, subd. 3). The five children of the Polks were a decided advantage in a foster care arrangement and perhaps another matter in adoption. The attained age of the Polks in foster care ■— a temporary assignment always — is of different consideration than when evaluated for the life-time assignment in prospective adoption. Then there are the matters of race and religion about which reasonable persons may and do differ. But that the mother should have the say on issues of race and religion seems reasonable and is accepted doctrine, so long as she has not abandoned *205 the child or is unfit (cf. Pierce v. Society of Sisters, 268 U. S. 510, 534r-535; Meyer v. Nebraska, 262 IT. S. 390, 399-402).*
Looming as important, even though less important than the controlling factors, is that foster care custodians must deliver on demand not 16 out of 17 times, but every time, or the usefulness of foster care assignments is destroyed. To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians the greater the risk that they will assert, out of love and affection grown too deep, an inchoate right to adopt. The temporary parent substitute must keep his proper distance at all costs to himself.
A case like this evokes compassion, most of all for the child, but at the same time it must be recognized that even in a permissive society the bearing of an illegitimate child has most often the effect of true tragedy — as irreversible as the breaking of an egg. In the Scarpetta case (supra) Judge Jasen said to the point: ‘ ‘ It is or should be obvious that the surrender of a child by its parent, whatever the circumstances or reason, has elements of tragedy in it and that pain, feelings of guilt, and suffering will not be avoided whatever course is taken. And, of course, the foster parents who hope to adopt the child are necessarily touched by the tragedy, guiltless and otherwise uninvolved though they be, if perchance the child is wrested from them on the annulling of a surrender. ” (28 N T 2d 185,188-189). And that case involved a child delivered for prospective adoption, a circumstance absent from this.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Jasen and G-ibson concur.
Order affirmed.

 Of critical significance, too, is the fact that in the absence of the mother being found unfit the adoption of the child by another could never take place. In the absence of abandonment, surrender, or unfitness the mother’s consent to adoption is essential (Domestic Relations Law, § 111). Thus, even if the Polks were given custody, adoption might never ensue.