BENJAMIN F. RAYSOR, JR., Appellant, v ARNOLD R. GABBEY, Respondent.

Fourth Department, May 27, 1977

*Barbara M. Sims* for appellant.

*Desmond & Drury (Edward Desmond* of counsel), for respondent.

Simons, J. This habeas corpus proceeding was initiated in Supreme Court and referred to Family Court to determine (1) whether petitioner was the natural father of Samantha Frances Raysor, (2) who should have custody of her and (3) the legal effect of letters of guardianship of her issued to respondent by Erie County Surrogate's Court November 19, 1973. Family Court determined that petitioner was Samantha's natural father, awarded permanent custody of her to her maternal grandparents, respondent Arnold R. Gabbey and his wife, Ruth Gabbey, and dismissed petitioner's challenge to the letters of guardianship as moot.

The order of Family Court should be reversed and the matter is remitted to Family Court, to be assigned to a different Judge, for further proceedings in accordance with this opinion.

Samantha was born on July 27, 1967 in New York City. She is the daughter of petitioner, now age 53, who is black, and Faith Gabbey, the daughter of respondent and Ruth Gabbey, who was caucasian. The parents of Samatha never married. Faith Gabbey died on November 11, 1973 from surgical complications. She was 30 years old at the time of her death.

Petitioner is a college graduate and a trained accountant. In 1968 he married a black woman and he continues to live and work in Manhattan. He and his wife have no children. Respondent is a dentist. He resides in Buffalo with his wife of 35 years and a handicapped son, age 25. Respondent was 62 years old at the time of trial and his wife was 57.

Habeas corpus was a proper proceeding to determine the issue of paternity *(Matter of Ricky M. v Sharon B.,* 49 AD2d 1035; *People ex rel. Meredith v Meredith,* 272 App Div 79), and the evidence that petitioner was Samantha's father was "clear, convincing and entirely satisfactory" (see *Matter of Hanley v Wilcox,* 57 AD2d 697, April 7, 1977 and cases cited therein). Indeed, the evidence of paternity was overwhelming. The record reveals that petitioner and Faith had been intimate with each other during the year when conception took place, that he took her to the hospital for the birth, he visited her and the baby there and paid the expenses of confinement and he is listed as the father on the birth certificate. He contributed to Samantha's support regularly until the time of

her mother's death. In letters written by Faith between 1967 and 1973 which were introduced into evidence, she repeatedly acknowledged that petitioner was the father. Furthermore, the Gabbeys have always known of petitioner and his relationship with Faith and that he claimed Samantha as his daughter. It does not appear that they ever questioned that claim before this proceeding was instituted, although they strongly resisted it at trial.

Immediately after Samantha's birth, petitioner offered to marry Faith, but fearful of the effect such a marriage would have on her family, she refused. Sometime in October, 1967 Faith decided to keep Samantha rather than release her for adoption. She returned to her family's home in Buffalo, not to live with them but to set up housekeeping by herself. She moved into an apartment on Janice Street, which is described as a racially mixed neighborhood. Faith and Samantha were supported by contributions from her parents, regular payments by petitioner and by what little money Faith could earn babysitting for others in the neighborhood. Petitioner visited Faith and his daughter in Buffalo two or three times per year up until her death, and communicated regularly with them by mail and telephone. After Faith died Dr. Gabbey and his wife took Samantha from the Janice Street apartment into their home in an all-white residential neighborhood in Buffalo where Samantha attends a private school.

When petitioner was notified of Faith's death in November, 1973 he requested that respondent return his daughter to him. Respondent temporized and on November 19, 1973, eight days after the death, obtained letters of guardianship from Surrogate's Court in Erie County. The petition to Surrogate's Court did not state the name of Samantha's father, and petitioner received no notice of the proceedings. This habeas corpus proceeding was instituted in Supreme Court by petition dated March 1, 1974, the writ was granted and the matter referred to Family Court for disposition. Respondent has not yet filed a return to the writ and did not produce Samantha before the court as directed until after demand by petitioner's counsel in August, 1974 (see CPLR 7006). Family Court's order in this proceeding was entered on February 25, 1975, almost one year after the petition was executed.

At the time of Family Court's order, it was the law of New York that a natural parent had a right to the care and custody of his child superior to all others and this right could

be dissolved only by abandonment, surrender, or unfitness *(People ex rel. Kropp v Shepsky,* 305 NY 465, 468-469; *People ex rel. Portnoy v Strasser,* 303 NY 539, 542). The father of an illegitimate child possessed this right no less than the father of a child born in wedlock *(People ex rel. Meredith v Meredith,* 272 App Div 79, 82, *supra; People ex rel. Blake v Charger,* 76 Misc 2d 577; *Fierro v Ljubicich,* 5 Misc 2d 202).

This presumption in favor of the natural parent has subsequently been modified by the Court of Appeals to the extent that the rule is now stated that a natural parent has a superior right to the care or custody of his child and this right may not be dissolved "absent surrender, abandonment, persisting neglect, unfitness or other like *extraordinary circumstances.* If any of such extraordinary circumstances are present, the disposition of custody is influenced or controlled by what is in the best interest of the child" *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 544, emphasis added; see, also, *Matter of Gomez v Lozado,* 40 NY2d 839). Before the nonparent may succeed against a parent in obtaining custody of the parent's natural child, the nonparent must satisfy the heavy burden of proving the disqualification of the parent through abandonment, neglect, unfitness or extraordinary circumstances and also that the best interests of the child compel awarding custody to the nonparent *(Matter of Bennett v Jeffreys, supra;* and see *Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 203-204; *People ex rel. Kropp v Shepsky, supra,* p 469). Indeed, for a court to award custody of a child to a nonparent without proof of the parent's disqualification is a denial of the parent's constitutional rights (see *Stanley v Illinois,* 405 US 645, 651).

Of course, petitioner has not surrendered Samantha, and we may set aside consideration of abandonment, persistent neglect or unfitness. Respondent's proof does not establish that petitioner should be disqualified from custody because of his conduct, and the court did not find that he was. Upon this record, however, we find that the fact of Samantha's mixed racial background and her life-long separation from her father meet the requirement of extraordinary cirumstances. In recognizing these extraordinary circumstances, we are quick to point out some of the mitigating factors present. For example, while it does not appear from the record that Samantha has ever been in petitioner's home, even for one night, the separation was not all of petitioner's making. He asked Faith to

marry him and she declined to do so. Furthermore, it was Faith who chose to leave New York and return to Buffalo to be near her parents, not petitioner who left his child. Indeed, everything in this record suggests that the separation of father and daughter was involuntary on his part and that he has attempted, within his means, to maintain a parental relationship with his daughter, even at long range (see *Matter of Bennett v Jeffreys, supra,* p 548; cf. *People ex rel. Gallinger v Gallinger,* 55 AD2d 1036). As far as the Gabbeys are concerned, they have not seen that much of their grandchild either. Mrs. Gabbey apparently visited her daughter regularly after Samantha's birth but Dr. Gabbey had very little contact with his granddaughter while Faith was alive (far less than petitioner, it appears). Furthermore, Samantha had lived with the Gabbeys only briefly before this proceeding was commenced. If this proceeding had been decided expeditiously, she would have lived with the Gabbeys only a few months by the time of the decision thereby nullifying much of the Gabbeys' claim that affinity to Samantha justified an award of custody to them. Certainly, these matters should be considered by the court on remittitur *(Matter of Bennett v Jeffreys, supra,* p 550; see dissent in *Obey v Degling,* 46 AD2d 731, revd 37 NY2d 768; and cf. *Matter of Lang v Lang,* 9 AD2d 401, 408-410, affd 7 NY2d 1029).

In determining the best interests of Samantha many factors must be considered, of course, but two paramount matters remain unanswered in this record.

First is the question whether the separation from the father has been so complete and the attachment to the grandparents so strong that custody of Samantha may not be transferred to her natural father without destructive emotional injury to her.

There is self-serving evidence in the record by both sides of comfortable homes, jobs, schools and such. At the age of seven, when this trial occurred, Samantha was apparently a successful student in school, happy in the racially mixed neighborhood of her mother's apartment and finding friends in the new neighborhood of her grandparents. On his side of the case, petitioner offered evidence of his apartment home in a metropolitan neighborhood with nearby playgrounds, schools and playmates, the tangible and visible things of life. But while there was some evidence of Samantha's indifference to her father, that testimony was less than persuasive and there

is a dearth of credible evidence of what Samantha's reaction to a change or to the *status quo* might be.

Second, it would seem self-evident that a child of a racially mixed union potentially faces special problems unknown to a child whose parents are both white or both black. Any decision on custody ought to reflect an awareness of the court of these problems and some consideration by it of which prospective custodian is best able to guide the child, not only for the present, but when she confronts them in the future.

Petitioner sought to introduce evidence on this aspect of the case by calling as a witness a trained social worker who testified from her experience with adoptions of racially-mixed children by white parents, particularly the problems which an obviously black young lady faces as she matures in an all-white environment. The Judge presiding seemed not much interested in these sociological considerations, but surely, the ability of the custodian to recognize the stresses arising through racial differences and deal with them intelligently should be a matter of first importance in weighing the child's best interests. If serious consideration is to be given to awarding the Gabbeys custody, it will be a matter of prime significance how the Gabbeys will accept Samantha and her black father and friends as she grows up and integrates not only with the Gabbeys' white community but with blacks sharing her ancestry. We can only guess from this record what the Gabbeys' attitudes in this respect will be in the future. So far they have excluded petitioner from their home and denied him access to his daughter. The record does not disclose any reason for this conduct which is related to the health and safety of Samantha, and their attitude is hardly conducive to the healthy growth and development of this racially-mixed black girl.

Decisions in these vital areas should not rest on inference alone. There should be background investigations by appropriate social agencies into the homelife and neighborhood environment of both petitioner and respondent and private interviews of the parties, including Samantha, her teachers and others who might have pertinent information helpful to the court. We see no necessity to reopen the record for further testimony. All the parties testified to the extent counsel or court considered necessary and to permit further oral testimony would only delay this proceeding. Nor do we see the necessity for calling additional witnesses other than the pro-

fessionals assigned by the court, and their reports may well be sufficient for a decision without the necessity of a personal appearance.

We next consider the issue of visitation pending a final determination of custody. The order appealed, as did all preliminary orders, denied all visitation to petitioner. He has not seen his daughter in three and one-half years, with the exception of one courtroom appearance. We find nothing in this record to warrant the court's order denying visitation pending final disposition of the case, and petitioner should be granted liberal visitation rights by Family Court (see *Hotze v Hotze,* 57 AD2d 85). Specifically, this should include the right of petitioner to visit his daughter in Buffalo at reasonable times and the right to take her on visits to New York City to stay in his home on weekends and holidays.

Insofar as the letters of guardianship are concerned, SCPA 1704 requires the petition to list the name of the father (subd 2) and the reason why a living parent should not be appointed guardian if the petitioner is not a parent (subd 6). Notice must be served on the parent (SCPA 1705, subd 1, par [a]). It has been held that these requirements permit an unwed father to participate in guardianship proceedings (see *Matter of Morgan,* 70 Misc 2d 1063). The letters in Samantha's case were issued without naming her father and without notice to him, and petitioner is entitled to have the letters vacated by Surrogate's Court because they were obtained by false suggestion (SCPA 711, subd 4). Respondent asserts that the omission was proper because at the time of the petition there had been no determination of paternity. We have now affirmed Family Court's finding of paternity but in any event it is unimportant whether respondent's failure to name petitioner as Samantha's father was deliberate, unintentional or the result of misunderstanding. The "false suggestion" of section 711 which justifies vacation by the court may be a false statement honestly made *(Kerr v Kerr,* 41 NY 272, 276; *Matter of Barasch,* 32 Misc 2d 548), or it may consist of a lack of candor by the petitioner in obtaining letters *(Matter of Shonts,* 229 NY 374). Certain it is that the letters are invalid to abrogate petitioner's rights without notice to him (see *Stanley v Illinois,* 405 US 645, *supra).*

Finally, petitioner raises several evidentiary questions. Recognizing that a new Judge will review this record, we indicate briefly some of the matters improperly before the court.

Specifically, the court erred in permitting counsel's questions which merely recited lengthy criminal statistics in Precinct 32 of New York City (wherever that may be), his unsupported statements of petitioner's alleged criminal acts, and the details of why petitioner's wife had not borne children. At one point the court erroneously directed petitioner to produce his income tax returns. His employment and income were fully explored and we see no reason for such returns to be produced.

What we have said above indicates our strong disapproval of the inordinate delay in completing this case. The proof at the trial required only parts of six days. Nevertheless, the court permitted the proceeding to continue long after petitioner sought "summary" relief by way of habeas corpus. The delay was inexcusable, and the case should be granted a preference on Family Court's calendar upon remittitur with our direction for prompt disposition upon receipt of the necessary reports.

The order should be reversed and the matter remitted to Family Court, Erie County, for appropriate social investigations, interviews and reports and for decision on the existing record as supplemented by those reports.

MARSH, P. J., MOULE, DILLON and WITMER, JJ., concur.

Order unanimously reversed with costs and matter remitted to Erie County Family Court for further proceedings in accordance with opinion by SIMONS, J.