In the Matter of CLARENCE DICKSON, Appellant, v JOHN LAS-CARIS, as Commissioner of the Onondaga County Department of Social Services, et al., Respondents.

Fourth Department, May 23, 1980

**APPEARANCES OF COUNSEL**

*Maurie Heins* for appellant.

*Richard Kram* for Ruby Kelly, respondent.

## OPINION OF THE COURT

*Per Curiam.*

The facts in the record before us in this dispute over custody reveal that petitioner-appellant Clarence Dickson, the natural father of three children aged 6, 7 and 8 years old, as a result of personal problems, in August, 1974 voluntarily placed his children with a friend, respondent Ruby Kelly. Petitioner brought a proceeding seeking custody and appeals from the order which denied his petition.

Concededly, where the question is whether all parental rights should be terminated, it is required that proof be adduced which "evinces a purposeful ridding of parental obligations and the foregoing of parental rights" *(Matter of Corey L v Martin L,* 45 NY2d 383, 391). So long as a "flicker of interest" exists on the part of a parent, a court is not free to extinguish these parental rights *(Matter of Susan W. v Talbot G.,* 34 NY2d 76). Such is not the present case.

Here petitioner father seeks custody of his own children. In *Matter of Bennett v Jeffreys* (40 NY2d 543), the Court of Appeals distinguished between those cases involving custody of children from those which involve the legal termination of parental rights. It held that the State may deprive a parent of custody upon a finding of surrender, abandonment, persisting neglect or other like (but rare) extraordinary circumstances. It observed that the fundamental principle guiding the courts remains the preservation of the natural family but that the presumption that the responsibility of child raising falls automatically to the natural parents may be rebutted (see *Matter of Bennett v Jeffreys, supra,* p 552).

Just what are and what are not extraordinary circumstances is not capable of precise definition. The words describe a narrow, but nevertheless, vague characterization. In *Bennett* the court found that surrender, abandonment, persisting neglect or occurrences otherwise resulting in an unfortunate or involuntary disruption of custody over an extended period of time were "merely illustrative" of extraordinary circumstances *(Matter of Bennett v Jeffreys, supra,* at p 546). The court may look at a variety of other factors and factors which form the best interest test may also be relevant in determining the existence of extraordinary circumstances (see *Matter*

*of Bennett v Jeffreys, supra,* at p 554 [FUCHSBERG, J., concurring]).

The differences between the two analyses are that considerations which would determine the child's best interest if written upon a clean slate are not necessarily enough to amount to extraordinary circumstances. Extraordinary circumstances, rooted in the past and largely historical, are found by looking to the causes of the parent-child separation while best interest looks at the present and includes expectations for the future. In exercising its discretion, the court must examine a variety of factors, but its decision must be narrowly focused on "clear evidence of unfitness or proof of an intention to surrender all parental responsibilities or a lack of interest in the child combined with acquiescence in custody by a nonparent" *(Tyrrell v Tyrrell,* 67 AD2d 247, 250, affd 47 NY2d 937).

In choosing to characterize the extended separation of petitioner and his children as abandonment, Family Court labeled it as "passive" abandonment to distinguish it from the degree of abandonment (labeled as "active") required by statute in a termination of rights proceeding. Without adopting this active/passive rationale, we conclude, nevertheless, that Family Court did not dilute the *Bennett* formulation of the rule on extraordinary circumstances in making its decision.

Accepting the court's determination on credibility, extraordinary circumstances did exist in this case triggering the best interest of the child test. The trial court disbelieved petitioner's testimony that he visited the children frequently in 1974-1975. It found that petitioner virtually dumped the children on Mrs. Kelly in August, 1974 and for all practical purposes, abandoned them to her care for the next two years, visiting only once or twice in 1974 and 1975, and not again until 1976. The court further found petitioner displayed callous indifference to his daughter's fate in 1975 in refusing to sign a hospital consent form and visiting her in the hospital only once or twice despite the serious nature of her operation. In addition, it noted petitioner's failure to make any support payments after February, 1975 and his failure to provide any clothing or other material support for the children either in 1974 when they were left with Mrs. Kelly or later. The children have continuously resided with respondent for nearly six years and the testimony indicates a psychological bonding

has been forged between Ms. Kelly and the children and not with petitioner.

The facts in this case are analogous, in terms of the length of abandonment and other extenuating circumstances which provided petitioner an opportunity to demonstrate his indifference to his children, to other cases which have found extraordinary circumstances to exist and warrant that finding here (see *Matter of Bennett v Jeffreys*, 40 NY2d 543, *supra*; *People ex rel. Wilson v Wilson*, 56 AD2d 794; *People ex rel. Gallinger v Gallinger*, 55 AD2d 1036; *Matter of Jonathan D.*, 62 AD2d 947; *Raysor v Gabbey*, 57 AD2d 437; *Guzzo v Guzzo*, 66 AD2d 833). Thus, we see no reason in this case to disturb the trial court's findings which are entitled to great weight *(Matter of Irene O.*, 38 NY2d 776, 777), particularly in view of the fact that petitioner is not foreclosed from regaining complete custody at some future time (see *Matter of Sanjivini K.*, 47 NY2d 374, 382).

The order should be affirmed.

CALLAHAN, J. (dissenting). We cannot concur with the result of the majority in affirming Family Court.

These children, the objects of our concern, have lived under abnormal conditions since birth. They were never properly cared for by their mother, an unconcerned and neglectful individual, who abandoned her family in the summer of 1974, thereby aggravating their problems. Clarence Dickson struggled to carry on under the circumstances with the help of baby-sitters. He sought the aid and assistance of family. When these sources proved unsuccessful, he approached Ruby Kelly, a long-time family friend. Upon receiving her favorable response, he consulted with his caseworker, Mr. Hungerford of the Onondaga County Department of Social Services, to complete arrangements for Mrs. Kelly to act as the children's caretaker with social services assistance. Mr. Dickson claims that this voluntary placement was temporary in nature until he could get back on his feet. Mrs. Kelly maintains, however, that the children were to be with her permanently. At the custody hearing, Mr. Hungerford testified that the children were not abandoned by their father and that he was to be accorded visitation privileges. There is a sharp dispute in the record as to the number of visitations petitioner made and whether visitation was curtailed at Mrs. Kelly's request or thwarted by her actions.

The relationship between the foster mother and the natural father became strained. In July, 1975, Janice was found to have a tumor requiring immediate surgery. The hospital solicited Mrs. Kelly's assistance in obtaining the father's consent. When located by Mrs. Kelly, he refused to execute the authorization permitting the surgery. Since he had previously given her power of attorney to act on his behalf, the hospital accepted her authorization to perform the required surgery. Thereafter in December, on the basis of information supplied by Mrs. Kelly that the father failed to visit the children regularly, Mr. Hungerford filed a permanent neglect petition in Family Court. Service was attempted by publication. When Clarence Dickson failed to appear, a default judgment was entered in February, 1976 terminating his parental rights. Less than two weeks later petitioner contacted Mr. Hungerford disputing the allegations and he was then advised to seek legal aid. In March, 1977 he made a motion to vacate the default judgment and sought visitation. While the Social Services Department originally opposed the motion on technical grounds, it recommended at that time the return of the care, custody and control of the children to their father. The court vacated the judgment of neglect and denied petitioner's request for visitation. Shortly thereafter the Department of Social Services withdrew its permanent neglect petition; nevertheless, the court refused to return custody of the children to their father.

In December, 1977, after Clarence Dickson had recently remarried, he commenced this proceeding pursuant to section 651 of the Family Court Act for the custody of the children. The court conducted the hearing in June, 1978 and in its decision rendered in December, 1978 stated that it did "not find petitioner to be an unfit parent and that he is not a drunkard, an incompetent, or a notoriously immoral person * * * nor does he suffer from any physical defect that would impair his abilities as a parent." While declining to terminate the father's parental rights, the court did, however, deny him custody and continued custody of the three children with the foster mother. Family Court determined (97 Misc 2d 610, 615) "that petitioner abandoned his children during 1975 as the term abandonment is defined in *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra*). The court makes this finding despite petitioner's visit to Janice once during that period. Further, his present regular visits to the children do not abrogate his

past abandonment. Petitioner's abandonment resulted in an unfortunate extended disruption of his custody of the children, a disruption voluntarily created by himself. The combination of his abandonment of his children and of his disruption of the custody of his children create an extraordinary circumstance of the rare nature set forth in *Matter of Bennett v Jeffreys (supra)."* In addition the court stated (p 613): "Thus, once one of the enumerated extraordinary events is found to have occurred, although such an extraordianry event may have taken place in the past and may not be the current situation, the best interest test is triggered and will determine the future custody of the child * * * In essence, the standard of abandonment in a custody case may be passive". The court further stated (p 611): "The *Bennett* standard is applicable despite the fact that the abandonment has terminated prior to the initiation of the proceeding."

True, in cases such as this, the decision of the nisi prius court is entitled to the greatest respect (see *Matter of Irene O.,* 38 NY2d 776, 777). However, in our view, Family Court improperly extended the interpretation of abandonment as an element for finding extraordinary circumstances by establishing a "passive abandonment" criteria. To hold that an abandonment, passive in nature, remote in time and now nonexistent, triggers the best interest test is unfair to children and too harsh a rule to apply. The definition of extraordinary circumstances does not vary but must in all cases be "narrowly categorized". Absent extraordinry circumstances, narrowly categorized, it is not within the power of a court, or, by delegation of the Legislature, court or social agency, to make significant decisions concerning the custody of children, merely because it could make a better decision or disposition *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 545, *supra).* History of visitation is but one element to be considered. In exercising its discretion, the court has to examine a variety of factors. Its decision must be narrowly focused on clear evidence of unfitness or proof of intention to surrender all parental responsibilities or a lack of interest in the child combined with acquiescence in custody by a nonparent *(Matter of Tyrrell v Tyrrell,* 67 AD2d 247, affd 47 NY2d 937). Sporadic visitation is not crucial in light of the disputes in the record over whether visitation was reduced in compliance with respondent's request or access to the children was thwarted. When all the facts and circumstances are viewed in

perspective, there is not enough in this record to establish abandonment or neglect or unfitness as is necessary to constitute extraordinary circumstances to deprive a parent of custody of his children (see *Matter of Sanjivini K.,* 47 NY2d 374; *Matter of Corey L v Martin L,* 45 NY2d 383).

It is fundamental to our legal and social system that it is in the best interest of a child to be raised by his parents unless the parents are unfit (see, e.g., *Matter of Spence-Chapin Adoption Serv. v Polk,* 29 NY2d 196, 204; *Matter of Corey L v Martin L, supra).* A natural parent has a superior right to the care or custody of his child and this right may not be dissolved, "absent surrender, abandonment, persisting neglect, unfitness or other like extraordinary circumstances. If any of such extraordinary circumstances are present, the disposition of custody is influenced or controlled by what is in the best interest of child" *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 544; see, also, *Matter of Gomez v Lozado,* 40 NY2d 839). Before the nonparent may succeed against a parent in obtaining custody of the parent's natural child, the nonparent must satisfy the heavy burden of proving the disqualification of the parent through abandonment, neglect, unfitness or extraordinary circumstances and also that the best interests of the child compel awarding custody to the nonparent *(Matter of Bennett v Jeffreys, supra; People ex rel. Kropp v Shepsky,* 305 NY 465, 469). Indeed, for a court to award custody of a child to a nonparent without proof of the parent's disqualification is a denial of the parent's constitutional rights (see *Stanley v Illinois,* 405 US 645, 651).

In all of this troublesome and troubled area there is an overriding basic fundamental principle. Neither law, nor policy, nor the tenents of our society would allow a child to be separated by officials of the State from its parent unless the circumstances are compelling. Neither the lawyers nor Judges in the judicial system or the experts in psychology or social welfare may displace the primary responsibility of child raising that naturally falls to those who conceive and bear the children. This is not so much because it is their "right", but because it is their responsibility *(Matter of Bennett v Jeffreys, supra,* p 552). The private interest here, that of a man and the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection *(Stanley v Illinois, supra,* p 657).

Sustaining Family Court's disposition leaves the children in

legal limbo, their status indefinite until the attainment of their majority. Infants have a constitutional right to a permanent home with permanent parents, and their right to avoid the limbo of years of foster care, and the right to be shielded from the concern and trauma attending changes of home in the event of changes of circumstances, has always been recognized as a paramount right (see *Rothstein v Lutheran Social Servs. of Wis. & Upper Mich.,* 405 US 1051).

Accordingly, in our view, the order of Family Court should be reversed and the petition granted.

CARDAMONE, J. P., SIMONS and SCHNEPP, JJ., concur in *Per Curiam* opinion. CALLAHAN and WITMER, JJ., dissent and vote to reverse and grant the petition in an opinion by CALLAHAN, J.

Order affirmed, without costs.