OPINION OF THE COURT
Hugh R. Elwyn, J.
Ariel La Croix, the putative father of a child born out of wedlock on August 19,1973, to Debra Campbell Deyo, now deceased, brings this paternity proceeding to have himself declared to be the father of the child so that he may have standing to seek the child’s custody (Family Ct Act, § 511). Upon the mother’s death on October 13, 1980 the child’s custody devolved upon his stepfather, Richard Deyo, who is named as a respondent in his representative capacity as the administrator of the mother’s estate, but not individually.
The court having decided that the petitioner has standing to maintain this proceeding to establish his status as the child’s natural father despite the fact that in order for the child to have been conceived when the mother was *90 under 17 years of age he necessarily committed the crime of sexual misconduct in violation of section 130.20 of the Penal Law, a class A misdemeanor (see Matter of La Croix v Deyo, 108 Misc 2d 382), the petitioner presented his proof in support of his claim in a two-part hearing. The first hearing was directed to the reception of proof in support of his assertion that he is the child’s natural father[1] and the second to proof in support of his assertion that since he is the child’s natural father, the mother being deceased, he is entitled to the child’s custody.
Shortly prior to the conclusion of the first hearing the Legislature amended section 532 of the Family Court Act by chapter 9 of the Laws of 1981, effective March 2,1981 to provide for the admissibility into evidence in a paternity proceeding of the results of the human leukocyte antigen (HLA) blood tissue tests. Upon motion of the petitioner the court ordered such tests to be performed at the petitioner’s expense.
The tests were performed upon blood samples taken from Ariel La Croix, the putative father and the child, Paul J. La Croix, by Leon N. Sussman, M.D. F.A.C.P. of the Lindsley E. Kimball Research Institute of the New York Blood Center, 310 East 67th Street, New York, New York, on June 11, 1981. The court has been assured by Dr. Sussman in writing that the mother’s death did not preclude the making of such tests, nor impair the validity of the conclusions to be drawn therefrom. The results of these tests which were received in evidence without objection,[2] pursuant to the provisions of section 532 of the Family Court Act as amended by chapter 9 of the Laws of 1981, effective March 2, 1981,[3] read as follows:
Calculation of Plausibility of Paternity
Combined Paternity Index (P.I.) = 3313
*91 Plausibility of Paternity (W) = .9997
According to Hummels Predicates — paternity is “practically proved.”
With the plausibility of paternity established by these tests at .9997, which is interpreted to mean “practically proved”, I find that the petitioner’s claim to be the father of this child has been proved by incontrovertible scientific evidence which is both “clear and convincing” and “wholly satisfactory”. With this kind of scientific evidence before the court, it is unnecessary to decide the applicability of CPLR 4519 to the petitioner’s testimony of sexual relations with the now deceased mother,[4] as to which decision had been reserved, or whether the quantity and quality of the petitioner’s other proof must be “entirely satisfactory” as in any other paternity proceeding (Matter of James J. v Valerie M., 98 Misc 2d 785, 787) or whether a lesser degree than that of “entirely satisfactory” might suffice and a finding of paternity, when sought by a father, made on only a preponderance of the evidence (Jaynes v Tulla, 70 AD2d 680).[5] On either standard of proof,[6] the scientific evidence in this case will admit of only one conclusion — the petitioner is indeed, as he claims to be, the father of this child.
Accordingly, I find the petitioner, Ariel La Croix, to be the father of the child Paul J. La Croix and an order of filiation may be entered declaring him to be such.
A person alleging himself to be the father of a child may now originate a proceeding to establish the paternity of the child (Family Ct Act, §§ 522, 523; see Matter of La Croix v Deyo, supra, and cases cited at p 383). The Family Court may make orders of custody or of visitation in any proceeding in which it makes a finding of paternity (Family Ct *92 Act, §§ 511, 549).[7] If the Family Court may make an order of custody in a paternity proceeding (Family Ct Act, § 511) there appears to be no logical reason why this authority should be limited to a proceeding in which the mother is the petitioner and not extend to a proceeding initiated by a putative father. To hold otherwise would constitute a constitutionally impermissible distinction based solely on gender (Caban v Mohammed, 441 US 380; Orr v Orr., 440 US 268), thereby denying a father the equal protection of the law (US Const, 14th Arndt).
The court therefore holds that this petitioner having been determined to be the child’s natural father has status to seek the custody of his out-of-wedlock child.
For well over a century New York courts had held that a father, even though unwed, had a right to the custody of his natural child, superior to the world, although inferior to the natural mother (People ex rel. Trainer v Cooper, 8 How Prac 288). In People ex rel. Meredith v Meredith (272 App Div 79, 82, affd 297 NY 692) the rule is stated that “the mother has the right to the custody of an illegitimate child as against the father, though the father has the right to the custody as against a stranger.” (See, also, Matter of Cornell v Hartley, 54 Misc 2d 732.) It is now firmly established that the fathers of out-of-wedlock children have rights which the courts must recognize (Stanley v Illinois, 405 US 645, supra). The Supreme Court of the United States there held “that it was violative of due process to deprive an illegitimate father of custody of his children, without a determination of his fitness * * * The court recognized that the interests of a father of an illegitimate *93 child are no different from those of other parents” (People ex rel. Blake v Charger, 76 Misc 2d 577, 580, supra; see, also, Caban v Mohammed, 441 US 380, supra; Domestic Relations Law, § 111, subd 1, pars [d], [e]; § 111-a; Social Services Law, § 384-c).
The superior rights of parents of the custody of their own children has been repeatedly affirmed by the Court of Appeals (Matter of Bennett v Jeffreys, 40 NY2d 543, 546; Matter of Corey L v Martin L, 45 NY2d 383, 391; Matter of Sanjivini K., 47 NY2d 374, 382; Matter of Dickson v Lascaris, 53 NY2d 204, 208; Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196; People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185; People ex rel. Kropp v Shepsky, 305 NY 465; People ex rel. Portnoy v Strasser, 303 NY 539), by the Appellate Division (People ex rel. Claudia “PP” v Sackey, 40 AD2d 130; Matter of Tyrrell v Tyrrell, 67 AD2d 247, affd 47 NY2d 937) and the Family Court (Matter of Spencer, 74 Misc 2d 557). Thus courts have “not hesitated to hold that a parent cannot be displaced because ‘someone else could do a “better job” of raising the child’ ” (Matter of Corey L v Martin L, supra, p 391). “The father of an illegitimate child possessed this right no less than the father of a child born in wedlock” (Matter of Raysor v Gabbey, 57 AD2d 437, 440). There is “no rule of law that would require a distinction to be made in applying this standard to an unwed natural father” (People ex rel. Blake v Charger, 76 Misc 2d 577, 580, supra).
This presumption in favor of the natural father has subsequently been modified by the decision of the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d r543, supra) to require the application of the best interest test when extraordinary circumstances are found to exist (Matter of Gomez v Lozado, 40 NY2d 839; Raysor v Gabbey, supra, p 440). However, “[b]efore the nonparent may succeed against a parent in obtaining custody of the parent’s natural child, the nonparent must satisfy the heavy burden of proving the disqualification of the parent through abandonment, neglect, unfitness or extraordinary circumstances and also that the best interests of the child compel awarding custody to the nonparent * * * Indeed, for a *94 court to award custody of a child to a nonparent without proof of the parent’s disqualification is a denial of the parent’s constitutional rights (see Stanley v Illinois, 405 US 645, 651).” (Raysor v Gabbey, 57 AD2d 437, 440, supra; see, also, Dennis T. v Joseph C., 82 AD2d 125, 133.)
Thus, Ariel La Croix, the natural father of this child, although never married to the natural mother has “rights” which the court must recognize, unless an application of the best interests of the child test because of the existence of one or more of the conditions set forth by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543, supra) requires otherwise. (Matter of Gomez v Lozado, supra, p 840.)
Except for the possible existence of extraordinary circumstances, which is a question of fact, none of the five special circumstances mentioned in Bennett (supra) exist in this case. The respondent makes no claim that the father has ever surrendered the child or that he has been guilty of persisting neglect or that he is in any way unfit; only that because of lack of concern and the infrequency of his contact he has abandoned the child.
The record will not support a finding of abandonment. Although the respondent’s witnesses testified to their recollection of the father’s lack of interest in the child manifested by infrequent contact and no financial support, the more credible evidence shows that in spite of the absence of a legally recognized parent-child relationship, the father maintained frequent contact with his son up until the time of his removal to Iowa in 1977 and thereafter through frequent telephone calls. He also provided considerable financial support for the child while he was in the service.
Even if full credence is given to the respondent’s evidence of the father’s lack of interest, the infrequency of the father’s contacts is insufficient, without more to demonstrate abandonment. There must be legally sufficient evidence to support the determination, which is not present in this record. (Matter of Corey L v Martin L, 45 NY2d 383, 389, supra.)
The standard of “passive abandonment” (see Matter of Dickson v Lascaris, 97 Misc 2d 610, 614) is not enough (Matter of Dickson v Lascaris, 53 NY2d 204, revg 75 AD2d *95 47). Consequently, the State may not deprive this father of the custody of his child for any of the first four reasons mentioned in Bennett (supra).
EXTRAORDINARY CIRCUMSTANCES
“Whether extraordinary circumstances exist is a question of fact (see Bennett v Jeffreys, supra, p 549)” (Milli v Morreale, 83 AD2d 173, 174). It is not capable of precise definition. The conditions mentioned in Bennett are “ ‘merely illustrative’ of extraordinary circumstances” (Matter of Dickson v Lascaris, 75 AD2d 47, 48, revd 53 NY2d 204, supra).
Illustrative of extraordinary circumstances is an “unfortunate or involuntary disruption of custody over an extended period of time.” (Matter of Bennett v Jeffreys, supra, p 546.) The father’s failure to exercise any custodial rights over his out-of-wedlock child may indeed be “unfortunate”; it has certainly been “involuntary”. However, in determining whether any extraordinary circumstances, rooted in the past and largely historical, exist, the court may look to the causes of the parent-child separation (Matter of Dickson v Lascaris, 75 AD2d 47, 49, revd 53 NY2d 204, supra). A look backward at the status of the law regarding the rights of fathers of out-of-wedlock children reveals that for much of the child’s life the father had no legal rights to the child’s custody which the law would recognize and thus had no right to the child’s custody to be disrupted.
The child was born on August 19, 1973. Two years earlier, on November 22,1971, the Appellate Division had unequivocally declared in “Doe” v “Roe” (37 AD2d 433, 436): “Under New York law the putative father has no parental rights with respect to a child born out of wedlock”. The mother had a paramount right to the custody of her illegitimate child as against the father, though the father had the right to custody as against a stranger (People ex rel. Meredith v Meredith, 272 App Div 79, 82, affd 297 NY 692, supra; see, also, Matter of Cornell v Hartley, 54 Misc 2d 732). It was not until April 3, 1972 when the United States Supreme Court decided Stanley v Illinois (405 US 645, supra) that fathers of out-of-wedlock children acquired constitutional rights to the custody of their children which New York courts were compelled to recognize.
*96 Even after Stanley (supra) nearly five more years would pass before it became clear with the passage of chapter 665 of the Laws of 1976,[8] effective January 1, 1977 that a putative father could maintain a paternity proceeding in his own right to establish his parentage of his out-of-wedlock child.[9]
With his right to maintain a paternity proceeding to establish his status to seek the custody of his out-of-wedlock child not recognized in New York until January 1, 1977 and his right to visitation, although sometimes granted, but severely curtailed,[10] and the open-ended financial exposure for the child support if paternity were acknowledged in a suit brought by the mother (Family Ct Act, § 571), there was little or no reason for a putative father to seek to assert rights which the law either denied him or were at best burdensome. Thus the state of the law with respect to the rights of the fathers of out-of-wedlock children explains in part, even if it does not wholly exonerate, the father for the extended period of time the child has spent in the mother’s custody. For the mother of an out-of-wedlock child to retain her custody is far more ordinary than extraordinary and does not, under the circumstances of this case constitute an “extraordinary circumstance”. In any event, the father’s acquiescence in this arrangement whereby he voluntarily consented that the child’s custody remain with the mother should not mean the eventual loss of the child to a stepparent (see Matter of Tyrrell v Tyrrell, 67 AD2d 247, 250, affd 47 NY2d 937, supra).
The three facts peculiar to this case, which in combination, might conceivably qualify this case as one of “extraordinary circumstances”, thus triggering a “best interests” test (Matter of Bennett v Jeffreys, 40 NY2d 543, 554, supra) are, of course, the child’s out-of-wedlock birth,* [11] the child’s *97 lifetime spent in the mother’s sole custody, and the mother’s untimely death in an auto accident.
In Matter of Raysor v Gabbey (57 AD2d 437, 440, supra) the Appellate Division found “that the fact of Samantha’s mixed racial background and her life-long separation from her father meet the requirement of extraordinary circumstances”, thus requiring an application of the best interests tests. While the facts of this case, i.e., out-of-wedlock birth and lifelong separation from the father are similar, the element of a mixed racial background is not present here.
More recently, however, the same Appellate Division in Matter of Tyrrell v Tyrrell (67 AD2d 247, affd 47 NY2d 937, supra) reversed Special Term which had found extraordinary circumstances sufficient to trigger the “best interests” tests under Matter of Bennett v Jeffreys (supra) in a mother’s agreement, forced upon her by economic circumstances, to place her child in her former husband’s custody who had remarried and the continuation of this agreed upon custodial arrangement until the husband’s death. The court held (pp 249-250) “that as presented here the acquiescence of one of the estranged parents of a child to placement of the child in the custody of the other and the continuation of that custodial arrangement while both parents are living * * * does not constitute the ‘extraordinary circumstances’ required in Matter of Bennett v Jeffreys (supra).”
“In all of the cases where extraordinary circumstances have been forced to exist there has been clear evidence of unfitness or proof of an intention to surrender all parental responsibilities or of a lack of interest in the child combined with acquiescence in custody by a nonparent.” (Matter of Tyrrell v Tyrrell, 67 AD2d 247, 250, supra.) The Court of Appeals affirmed (47 NY2d 937, 938) “for reasons stated in the opinion * * * at the Appellate Division (67 AD2d 247).”[12]
*98 Here the father’s acquiescence in custody was not to a nonparent, but to the child’s own mother, for which, as previously noted, there were adequate and sufficient reasons, and there is no evidence whatever of the father’s unfitness or that he ever intended to surrender his parental responsibilities or any lack of interest in the child. On the contrary the record is replete with evidence from which it can be found that the father is a wholly fit parent who has over the years and in spite of great distances[13] separating him from his child, maintained frequent contact, personally, by letters, telephone calls and gifts.
The circumstances of this case I find to be more similar to those in Matter of Tyrrell v Tyrrell (supra) then those in Matter of Raysor v Gabbey (supra). The former is more recent and the decision of the Appellate Division was affirmed by the Court of Appeals (47 NY2d 937). Consequently, I do not find the circumstances of the case to qualify as the “extraordinary circumstances” mentioned in Matter of Bennett v Jeffreys (supra).
Since the existence of “extraordinary circumstances” have not been found to exist the “best interests” test has not been triggered and need not be applied to a resolution of the issue of the child’s custody. The petitioner, having established beyond any peradventure of a doubt his fatherhood of this child, has an absolute right to this child’s custody superior to anyone else in the world, the mother being dead and there being no question as to his fitness which the court must recognize. To hold otherwise would be a denial of his constitutional rights (Stanley v Illinois, 405 US 645, supra; Matter of Tyrrell v Tyrrell, 67 AD2d 247, affd 47 NY2d 937, supra).
Even, however, if the circumstances of this case should be deemed to qualify as “extraordinary circumstances” so as to require that the determination of the child’s custody be controlled by an application of the “best interests” test, the result has to be the same as that reached through a *99 recognition of the natural father’s superior rights over those of nonparents, for the respondent has not, in my judgment, met the heavy burden of demonstrating that the best interests of the child require that he remain with nonparents.
The father’s fitness as a parent is unquestioned, his concern for the boy’s future has been amply demonstrated and he has the financial ability to provide adequately for him. The father is now married and is a member of an extended family with strong family ties, whereas the stepfather lives with a woman to whom he is not married and who has left her own child to be raised by others. Although an adulterous relationship may not be a significant factor in determining a child’s best interest (Matter of Saunders v Saunders, 60 AD2d 701; People ex rel. Seibert v Seibert, 60 AD2d 692), there is no need to choose such an environment for a child when the option of a more wholesome environment is open. The mother figure which the stepfather has to offer the child has, to judge from her marital history and peripatetic life-style, a questionable capacity to fill a mother’s role.
As for the alternative home environments to which the child might be subjected, photographs of the natural father’s home in Iowa show a middle-class home in a suburban neighborhood, whereas there is nothing in the record to support a finding that the stepfather’s home in Kerhonkson is a preferred environment over the father’s home in Iowa.
In short, in spite of the boy’s emotional attachment to the Deyo household, where he has spent his whole life, and the possible destructive emotional injury to him if removed therefrom, which is indeed a most serious consideration (see Matter of Raysor v Gabbey, 57 AD2d 437, 441, supra), the court is not persuaded that the respondent has met the heavy burden of demonstrating that the child’s future best interests would be promoted by leaving him in his present environment in legal limbo with a nonparent, who could never adopt the child without the father’s consent (Domestic Relations Law, § 111; Caban v Mohammed, 441 US 380, supra) when there is a natural father who has not been proven to be unfit and who is ready, willing and able to *100 assume responsibility for his upbringing. The short-term emotional injury to the boy which may be anticipated by his removal from the Deyo household should not be obscure or cancel out the long-term benefits that may be expected to accrue to him by being raised by a loving and concerned father, whom, I am satisfied, is sincerely motivated in his quest for his son’s custody.
To award the custody of this child to his natural father is in accord with the “generally accepted view that a child’s ‘best interest’ is [to] be raised by its parent unless the parent is disqualified by gross misconduct” (Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 204, supra). As was said recently by the Court of Appeals, “Rather than artificially exalting the ‘rights’ of the parent at the expense of the well-being of the child, this rule fosters both interests by recognizing that they ordinarily converge.” (Matter of Dickson v Lascaris, 53 NY2d 204, 208, supra.)
Such a decision is also in accord with the declared public policy of the State (McKinney’s Cons Laws of NY, Book 1, Statutes, § 126) as contained in section 384-b (subd 1, par [a], cl [ii]) of the Social Services Law where it is declared that “it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered”. There is no proof in the case that the child’s best interest would be endangered by recognizing the natural father’s superior rights to the custody of his out-of-wedlock child.
Accordingly, the order of filiation to be entered herein may include a provision awarding the petitioner the custody of the child (Family Ct Act, § 511), for I am satisfied that, in this case, the natural father’s superior “rights” and the child’s “best interests”, coincide.
The court hastens to add, however, that because the child has lived all its life in either his mother’s or grandmother’s home the court recognizes that undoubtedly the child has formed strong emotional attachments to his *101 grandmother and perhaps to his stepfather as well. It may be anticipated that the child may resent the implementation of this decision because of his attachment to his grandmother and lack of contact with his natural father, who may appear to the child as a virtual stranger.
These conclusions are strongly supported by the court’s interview with the child[14] and the testimony of the respondent’s expert witness, Dr. Projansky, who emphasized the strong attachment the child has formed to his stepfather and grandmother and the emotional trauma that might be caused to the child, through his sudden removal from the household, thereby adding their loss to the already sorrowful and irretrievable loss occasioned by his mother’s untimely death. The court is not unmindful of these painful considerations, but is confident that in time the boy, through the natural resilience of his youth, can and will adjust to his misfortunes and the change in his custody necessitated by the circumstance of his birth.
The court therefore would like to suggest to the petitioner that some forbearance and a great deal of tactful persuasion may be necessary before the boy accepts the true facts of his birth and the father’s concomitant rights to his custody. The court would further suggest to the petitioner that simply because he has been successful in establishing his fatherhood and that this court has been obliged to recognize his legal rights which necessarily flow therefrom that he not preclude the child’s grandmother or his stepfather from all contact with the child who undoubtedly has developed strong emotional ties to them both. With a modicum of goodwill the parties themselves should be able to reach some acceptable resolution of the conflicting emotional attachments to which this tragic situation has inevitably given rise.
*102 In accordance with the Law Guardian’s recommendation, with which the court concurs, and in deference to the child’s need to make an adjustment to the much closer association with his real father than he has ever had before and to a new home environment which may be quite different than the one he has become accustomed to, the full implementation of this decision will be deferred until the conclusion of the 1981-1982 school year in June, 1982.
In the interim and in order to facilitate the child’s adjustment to his real father and a new home environment the father is accorded the right of visitation with his son in the State of Iowa, provided he will pay the necessary transportation costs, for the full period of the child’s Christmas and spring or Easter school recess. If the father should conclude that transporting the child to the State of Iowa is for any reason impractical he may, at his option, exercise similar visitation rights with the child in the State of New York. (Family Ct Act, § 549; Hotze v Hotze, 57 AD2d 85; Matter of Raysor v Gabbey, 57 AD2d 437, supra.)

. An adverse finding on this point would have rendered the custody issue moot.

. See Matter of Carmen I. v Robert K. (110 Misc 2d 310) with regard to the problem presented by the admissibility in paternity proceedings of HLA blood tests in laboratory report form.

. The Family Court of New York County has upheld the constitutionality of the recently enacted statute which allows into evidence the results of the human leukocyte antigen (HLA) blood test in paternity proceedings (L 1981, ch 9). (See Matter of Jane L. v Rodney B., 108 Misc 2d 709.)

. Cf. People ex rel. Blake v Charger (76 Misc 2d 577, 578) which holds that although acts of intercourse and cohabitation are transactions within the meaning of the statute, testimony as to acts of intercourse is admissible and does not come within the prohibition of CPLR 4519.

. See allusion to this problem in Matter of La Croix v Deyo (108 Misc 2d 382, 385).

. Contrast with Jaynes v Tulla (70 AD2d 680) where applying either standard of proof, appellant failed to establish his paternity of the child.

. Contra to this statutory authority is Matter of Kordek v Wood (108 Misc 2d 434) wherein the Family Court of Onondaga County held that “[w]hen a child born out of wedlock is adequately supported by its mother and there is no likelihood that the child may become a public charge, no relief is available to a putative father in a paternity action in Family Court, since a paternity proceeding is brought to insure the support of a child born out of wedlock * * * and no status giving rise to the rights of'fatherhood is conferred by an article 5 proceeding.” This holding appears to be out of harmony with such cases as Stanley v Illinois (405 US 645) and Caban v Mohammed (441 US 380) which have greatly expanded the legal rights of fathers of out-of-wedlock children (see, also, Matter of Pierce v Yerkovich, 80 Misc 2d 613) which decisions have been implemented by legislation designed to secure a fuller recognition of these rights (see, e.g., Domestic Relations Law, § 111-a; Social Services Law, § 384-c).

. See La Croix v Deyo (108 Misc 2d 382, and cases cited at p 383, n 1).

. Chapter 665 of the Laws of 1976 amended section 522 of the Family Court Act, entitled, “Persons who may originate proceedings” by inserting the phrase, “by a person alleging to be the father, whether a minor or not.”

. See Matter of Pierce v Yerkovich (80 Misc 2d 613, 614-616, supra).

. With over a half million out-of-wedlock births in this country annually (see Time, Sexes Black & White, Unwed All Over, Nov. 3, 1981, p 63) the child’s out-of-wedlock *97 birth may no longer be considered “extraordinary”. Since the incidence of sudden death has likewise become so common, the mother’s sudden death may no longer be “extraordinary”. (Cf. Matter of Tyrrell v Tyrrell, 67 AD2d 247, 252, affd 47 NY2d 937, supra.)

. See, also, Family Law Review (vol 12, No. 4, Davidson and Gates, Custodial Claims of Stepparents and the Extraordinary Circumstances Doctrine) published by the *98 Family Law section of the New York State Bar Association, which discusses the decision of Matter of Tyrrell v Tyrrell (67 AD2d 247, affd 47 NY2d 937) in light of the “extraordinary circumstances” doctrine of Matter of Bennett v Jeffreys (40 NY2d 543).

. For two years the father was in service stationed in various parts of the United States and for approximately a year stationed in Germany. Since 1977 he has resided in the State of Iowa.

. The court interviewed the child in the absence of the parties or their counsel (Matter of Lincoln v Lincoln, 24 NY2d 270). Although the child professed not to recognize the petitioner as his father and expressed a preference to remain with his stepfather, the wishes of a child only eight years old are not controlling and should not deter the court from making a contrary determination if in the court’s judgment the best interests of the child require it (Matter of Dintruffv McGreeuy, 34 NY2d 887; Matter of Metz v Morley, 29 AD2d 462, 466; People ex rel. Glendening v Glendening, 259 App Div 384, affd 284 NY 598; Matter of Hahn v Falce, 56 Misc 2d 427, 434-435).