■ In the Matter of ARIEL LA CROIX, Respondent, v RICHARD DEYO, as Administrator of the Estate of DEBRA C. DEYO, Deceased, Appellant. — Appeal from an order of the Family Court of Ulster County (Elwyn, J.), entered December 17, 1981, which adjudged petitioner to be the father of a child born August 19, 1973 and awarded custody of that child to petitioner. Petitioner commenced the present proceeding seeking an adjudication that he is the father of a child born August 19, 1973, and seeking custody of that child. He was never married to the child's mother who married respondent in 1976 and died as a result of an automobile accident in October, 1980 shortly before this

proceeding was commenced. In 1976, while in the service stationed in Germany, petitioner married and since 1977 he has resided in Iowa. The Family Court adjudged petitioner to be the father of the child and this part of the order is not disputed on this appeal. It is argued, however, that the court erred in awarding custody of the child to petitioner. Initially, respondent contends that he commenced an adoption proceeding pursuant to section 111 of the Domestic Relations Law and, therefore, the standards set forth in that statute should have been applied. No mention was made of any adoption proceeding in the court's decision and no papers relating to an adoption proceeding are contained in the record on appeal. Consequently, we conclude that section 111 of the Domestic Relations Law is not applicable herein. Petitioner, as the natural parent of the child, is entitled to custody of his child absent extraordinary circumstances, and if extraordinary circumstances are presented the court must then inquire into the best interest of the child in order to resolve the issue of custody (*Matter of Bennett v Jeffreys,* 40 NY2d 543). In the instant case, the court found no extraordinary circumstances presented and, therefore, awarded custody of the child to petitioner. We agree with this finding and award of custody. Although the child in question was born in 1973, it was not until January 1, 1977 that petitioner was clearly entitled, by statute, to maintain a paternity proceeding (Family Ct Act, § 522, as amd by L 1976, ch 665, § 6). Nor can petitioner be faulted under the circumstances herein for acquiescing in the mother's custody of the child. The Family Court found that petitioner maintained frequent contact with the child both personally and by letters, telephone calls and gifts. In deciding this issue, the court was confronted with questions of credibility and such questions are usually left to the trier of fact (*Matter of Schenectady County Dept. of Social Servs. v Hilvan RR,* 57 AD2d 688). We find no reason on this record to disturb the court's decision in this regard. From our review of the entire record, we are of the opinion that extraordinary circumstances as discussed in *Matter of Bennett v Jeffreys* (40 NY2d 543, *supra*) are not presented herein and thus conclude that custody of the child was properly awarded to petitioner (see *Matter of Dickson v Lascaris,* 53 NY2d 204; *Tyrrell v Tyrrell,* 67 AD2d 247, affd 47 NY2d 937). We have considered respondent's remaining arguments and find them unpersuasive. The order should be affirmed. Order affirmed, without costs. Sweeney, J. P., Main, Casey and Weiss, JJ., concur.

Levine, J., dissents and votes to reverse in the following memorandum. Levine, J. (dissenting). I respectfully dissent. The unrebutted testimony of respondent's psychological expert, the Associate Director of Mental Health Services for Ulster County, whose major clinical experience has been the treatment of children and adolescents, was that having recently lost his mother in a sudden, unexpected, fatal accident, the enforced separation from his stepfather and maternal grandmother — the child's only other major sources of nurturance — "would represent a major, major destruction in his life on top of what has been clearly a traumatic experience." The intimacy and importance of this eight-year-old's relationship with his stepfather and maternal grandmother (who participated in his rearing from birth and fully supported the position of the stepfather in this proceeding) can perhaps best be portrayed by two additional excerpts from the expert's testimony, concerning his observations of the interaction between the child and these adults. He testified: "One of the things that happened, as we drove in I followed Mr. Deyo and he got out of his car just as I was coming in the driveway and I saw Paul run to him and get picked up without Paul having seen me. It undercut any cynicism I had if I felt it was put on for my benefit. It seemed like a loving interaction between the two of them." And referring to the child and the

grandmother, the expert stated: "I can almost see children drinking from an adult's body. Its a very — there is a drawing of love that happens and its a specific thing that one can recognize." This expert testimony, uncontroverted, and unshaken on cross-examination, taken with the additional uncontested evidence that at least for the last four years of the child's life there had not been any meaningful relationship whatsoever between the biologic father and the child, that the sum total of the father's financial support of the child during that period was a single check for $35, that until the commencement of this proceeding no legal relationship between the biologic father and the child had been established, and that the father had never been a part of the child's family unit, established extraordinary circumstances to trigger a best interests determination as a matter of law (*Matter of Bennett v Jeffreys,* 40 NY2d 543; see, also, *Matter of Gomez v Lozado,* 40 NY2d 839, mot for rearg den 40 NY2d 918; *Matter of Bannister v Bannister,* 81 AD2d 913; *Matter of Wade C. v Rachael D.,* 78 AD2d 937; *Guzzo v Guzzo,* 66 AD2d 833; *Raysor v Gabbey,* 57 AD2d 437; *People ex rel. Wilson v Wilson,* 56 AD2d 794). Prior to *Bennett,* the New York courts exalted the possessory rights of biologic parents in contests with nonparents to the point of almost absolute supremacy, subject only to forfeiture upon proof of serious parental misconduct, i.e., abandonment, unfitness, surrender, or persistent neglect (see *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.,* 28 NY2d 185, cert den 404 US 805; *People ex rel. Anonymous v Anonymous,* 10 NY2d 332; *People ex rel. Kropp v Shepsky,* 305 NY 465; *People ex rel. Portnoy v Strasser,* 303 NY 539). *Bennett,* however, for the first time recognized that the absence of a functional parent-child relationship, arising out of long-standing separation — even if brought about without parental fault, afforded the courts a basis for objectively determining whether turning the child over to the biologic parent would be detrimental to its best interests. There is no other way fairly to read *Bennett's* inclusion within "extraordinary circumstances" of not only the traditional instances of misconduct, but also "unfortunate or involuntary disruption of custody over an extended period of time" (*Matter of Bennett v Jeffreys, supra,* p 546). In *Bennett,* the court held that the "prolonged *separation* from the child for most of its life" (*id.,* at p 544; emphasis added) was in and of itself sufficient to trigger a best interests determination. Indeed, the uncontested facts in the instant case pose far more compelling "extraordinary circumstances" than the following illustration given in *Bennett:* "Moreover, the child may be so long in the custody of the nonparent that, even though there has been no abandonment or persisting neglect by the parent, the psychological trauma of removal is grave enough to threaten destruction of the child" (*id.,* at p 550). The Family Court's determination that no extraordinary circumstances existed under the uncontested facts is demonstrably based upon an erroneous application of the case law and upon factual determinations unsupported by the evidence. The court principally relied upon *Matter of Dickson v Lascaris* (53 NY2d 204) in making its determination on this issue, interpreting *Dickson* as a retreat from *Bennett.* However, *Dickson* is totally distinguishable from the instant case, involving a disruption of *regular* parent-child contact for little more than a year and whether that disruption constituted an abandonment.[1] Having found that no such abandonment took place here, the Family Court made short work of "unfortunate or involuntary" separation as an alternative extraordinary circumstance, concluding that because New York did not permit a putative father to file a paternity petition until January 1, 1977 (L 1976, ch 665), the natural

---

1. In its original decision in the instant case, which the Family Court inexplicably withdrew after this appeal was initiated, and for which it substituted its decision (dated the same date) now under review, the court even further misread *Dickson* as holding that nothing less than abandonment constituted extraordinary circumstances.

father cannot be faulted for the unfortunate or involuntary disruption of custody. The apparent, self-contradictory reasoning of the court is that because the law prevented the father's *voluntary* exercise of parental rights, there cannot be any extraordinary circumstance based on an *involuntary* disruption of contact. The court was clearly erroneous, however, in assuming that the father had no legal recourse to assert rights of custody or visitation. Parenthood itself has never been a requisite for standing in custody or visitation matters (*Finlay v Finlay,* 240 NY 429, 434 [Cardozo, J.]). The standing of putative fathers to seek custody or visitation by way of writ of habeas corpus or petition was recognized well before the 1976 amendment of the Family Court Act (*Raysor v Gabbey,* 57 AD2d 437, 438, *supra; Matter of Ricky M. v Sharon B.,* 49 AD2d 1035; *People ex rel. Meredith v Meredith,* 272 App Div 79, affd 297 NY 692; *Matter of Pierce v Yerkovich,* 80 Misc 2d 613; *Matter of Cornell v Hartley,* 54 Misc 2d 732). Nor does the court explain why no weight was given to the failure of the natural father to exercise his parental rights (and even more importantly, his parental responsibilities) for the nearly four-year period following January 1, 1977. The fact of the matter is that the father's prolonged separation from the child and his failure to exercise his parental rights and responsibilities were at all times voluntary, beginning in 1974 when he resigned local employment and entered the military service, when thereafter he failed to provide a military dependents' allotment for the child, and when he voluntarily relocated in Iowa in 1977 and never returned until the death of the mother. There is not a scintilla of evidence that the natural mother, the maternal grandmother, or the stepfather ever obstructed any attempt by the father to establish and maintain contact with the child. Other serious legal errors are disclosed in the Family Court's decision. By a form of distorted logic, the court concluded that petitioner's status as the father of an out-of-wedlock child was an ameliorating factor in his favor. But when, as here, there is no significant parent-child relationship, illegitimacy is a factor diminishing, not enhancing, parental rights, even to the extent of permitting adoption by a stepparent without the natural father's consent (*Quilloin v Walcott,* 434 US 246; Domestic Relations Law, § 111, subd 1, par [d].[2] In this respect, *Matter of Tyrrell v Tyrrell* (67 AD2d 247, affd 47 NY2d 937), relied upon by the Family Court on the extraordinary circumstances issue, is clearly distinguishable. There, Special Term's denial of custody to the natural mother, not the father of an out-of-wedlock child, was reversed on appeal, based principally upon the lower court's finding that "a 'wholesome, active and mutually loving relationship' existed between [mother and child]" (67 AD2d 247, 249). Moreover, the Family Court's finding that after his move to Iowa the father maintained frequent contact with the child through letters, telephone calls, and gifts is clearly inconsistent with its further finding that "it may be anticipated that the child may resent the implementation of this decision because of his attachment to his grandmother and *lack of contact with his natural father, who may appear to the child as a virtual stranger*". (Emphasis added.)[3] Similar internal factual inconsistencies and erroneous legal conclusions characterized the court's findings on best interests. Thus, it is hard to reconcile the court's recognition of "the boy's emotional attachment to the Deyo household, where he had spent his whole life, and the *possible destructive emotional injury to him if removed therefrom*" (emphasis added) with its subsequent statement that "there is *no proof* in the case *that the child's best interests would be endangered*

---

2. It is ironical that if the court had not declined to entertain the stepfather's petition for adoption, the uncontested proof of sparse contacts and lack of support appears to present a prima facie case for an adoption without the father's consent.

3. The father testified that he telephoned as seldom as once every other month. He could only document six calls in four years, however.

*by recognizing the natural father's superior rights* to the custody of his out-of-wedlock child" (emphasis added). Additionally, the court imposed upon the stepfather a "heavy burden of demonstrating that the best interests of the child require that he remain with a non-parent", although nowhere in *Matter of Bennett v Jeffreys (supra)* or in *Raysor v Gabbey (supra)* (the nearest case factually in point), once extraordinary circumstances are established, is a second, *"heavy"* burden imposed upon the nonparent to prove best interests. The court cites three factors as decisive of its finding on best interests, namely, the fitness of the natural father, the meretricious relationship between the stepfather and the woman living in his household, and the stepfather's inability to adopt the child without the father's consent. In a case such as this, however, where the father seeks to change custody in his favor, the first two factors are insufficient as a matter of law to justify switching custody (see *La Veglia v La Veglia*, 54 AD2d 727; *Macari v Macari*, 50 AD2d 818; and see *Matter of Saunders v Saunders*, 60 AD2d 701; *People ex rel. Selbert v Selbert*, 60 AD2d 692; *Matter of Feldman v Feldman*, 45 AD2d 320). And, as previously noted, the uncontested proof of lack of contact and support might well have permitted an adoption by the stepfather without the natural father's consent (Domestic Relations Law, § 111, subd 1, par [d]). The court, moreover, totally ignored the most significant factor in change of custody cases, namely the desirability of maintaining continuity of care (*Matter of Bennett v Jeffreys, supra*, p 550; *Obey v Degling*, 37 NY2d 768, 770). In the light of such lack of contact and support, of the unrebutted proof of the child's strong attachment to his stepfather and grandmother, of his favorable adjustment to his mother's death under their care, and of the expert testimony of his compelling need for these adult sources of emotional support and nurturance, the Family Court's finding of best interests in favor of the natural father is hardly more than an indulgence in a legal fiction.[4] The Family Court's determination is contrary to the law, contrary to the state of modern scientific knowledge of child development[5], and, worst of all, a tragedy for the child who is the subject of this proceeding and for whom we profess to exercise the State's *parens patriae* responsibilities. In affirming, the majority sanction a reversion to the unfortunate, pre-*Bennett* era of parental rights supremacy over the true best interests of children. The Family Court's order should be reversed, and the matter remitted for a further hearing on whether visitation by petitioner would be in the child's best interests.

---

4. Perhaps the best indications of the total disregard of the actualities of the child's best interests were the court's assertion that there was nothing "extraordinary" about the death of his mother, and its unsupported reliance on the "natural resilience of his [the child's] youth" as the final rationalization for its decision.

5. See, generally: J. Piaget, The Construction of Reality in the Child (1937); A. Freud & D. Burlingham, Infants Without Families (1944); J. Bowlby, Maternal Care & Mental Health (1951); Attachment & Loss (1969); "Separation Anxiety: A Critical Review of the Literature", Journal of Child Psychology and Psychiatry, p 251 (1961); Erik H. Erickson, Identity & The Life Cycle (1959); F. Brow, "Child Bereavement and Subsequent Psychotic Disorder", 112 British Jour of Psychiatry 1035 (1966); J. Goldstein, A. Freud, A. Solnit, Beyond the Best Interests of the Child (2d ed, 1979) (particularly pp 12-20).