MARCO MILLI, Respondent, v JOANN MORREALE, Appellant.

Fourth Department, November 13, 1981

APPEARANCES OF COUNSEL

*Redmond & Parrinello (John R. Parrinello* and *John P. Lomenzo* of counsel), for appellant.

*Tarricone, Bilgore, Weltman, Silver, Albert & Feldman (Garry S. Hanlon* of counsel), for respondent.

*Anthony C. Noto,* guardian ad litem.

OPINION OF THE COURT

*Per Curiam.*

It is a fundamental rule that "[t]he parent has a 'right' to rear its child, and the child has a 'right' to be reared by its parent" *(Matter of Bennett v Jeffreys,* 40 NY2d 543, 546, quoted in *Matter of Tyrrell v Tyrrell,* 67 AD2d 247, 248, affd 47 NY2d 937). It is also settled that "[b]efore custody may be awarded to a nonparent based on the best interest of the child against the wishes of a parent, the court must make the threshold determination that extraordinary circumstances exist. The best interest of the child, as such, is not involved in this threshold question. Thus, courts have 'not hesitated to hold that a parent cannot be displaced because "someone else could do a 'better job' of raising the child"' *(Matter of Corey L. v Martin L.* [45 NY2d 383, 391])" *(Matter of Tyrrell v Tyrrell,* 67 AD2d, at p 248).

Whether extraordinary circumstances exist is a question of fact (see *Matter of Bennett v Jeffreys, supra,* p 549). We see no basis in the record for disturbing the detailed findings and the conclusion of the Surrogate on this issue. Moreover, the evidence supports the court's finding that to return the child to the father would be in the child's best interests and that "[n]o valid reason exists for continuing the physical separation that now exists between [the child] and her father." The order should, therefore, be affirmed.

DOERR, J. (dissenting). I respectfully dissent.

The infant, Valentina Milli, is presently three and one-half years old. Her mother, Linda, married petitioner in September, 1977 while she was in Italy pursuing studies to become an interpreter. Marital discord developed within five months of Valentina's birth in March, 1978 and Linda returned to the home of her parents in Rochester, New York, bringing Valentina with her. Petitioner remained in Italy. After eight months of no contact with his family, petitioner journeyed to Rochester in April, 1979 in an effort to reconcile with Linda, an effort which proved fruitless. In January, 1980 Linda commenced an action for divorce against petitioner who returned to Rochester in April, 1980, at which time he consented to a default divorce which awarded custody of the child to Linda. The divorce decree required petitioner to pay $150 per month for the support of Valentina and while there is some dispute on the question, it appears that petitioner substantially complied with the decree. In October, 1980, Linda died of bone cancer. Petitioner was aware in May, 1979 that Linda was terminally ill with this disease.

On the petition of Joann Morreale, Linda's sister, the Surrogate issued letters appointing her guardian of the person of Valentina, as requested in Linda's last will and testament. Sometime late in December, 1980, petitioner learned of Linda's death and shortly thereafter returned to Rochester and instituted the present proceedings in which the parties agreed that the court would determine their relative custodial rights to Valentina.

In all custody disputes between a natural parent and a custodial nonparent and in recognition of the presumption of the superior right of a natural parent to custody of his

child, the controlling law was established in *Matter of Bennett v Jeffreys* (40 NY2d 543, 549) holding that: "[I]ntervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, *unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance* which would drastically affect the welfare of the child." (Emphasis added.) A court may not look to the best interests of the child until the threshold test recited above has been met, presumably independent of all other considerations. Most of the illustrative, but not exhaustive, examples of extraordinary circumstances set forth in *Matter of Bennett v Jeffreys (supra)*, i.e., surrender, abandonment, unfitness, persistent neglect, are not difficult to comprehend. None of these circumstances exist in the instant case. Whether and to what extent there has been an unfortunate or involuntary extended disruption of custody which would drastically affect the welfare of the child is a concept not easily resolved. These words are a vague and imprecise characterization of extraordinary circumstances. We are, however, not without guidance, supplied by *Matter of Bennett v Jeffreys (supra)* and the many cases which followed.

In *Raysor v Gabbey* (57 AD2d 437, 441), extraordinary circumstances were found to exist because of the child's mixed racial background and her lifelong separation from her father even though "the separation of father and daughter was involuntary on his part and * * * he has attempted, within his means, to maintain a parental relationship with his daughter, even at long range (see *Matter of Bennett v Jeffreys, supra*, p 548; cf. *People ex rel. Gallinger v Gallinger,* 55 AD2d 1036)". Indeed, in *Matter of Bennett v Jeffreys (supra,* p 550), the court found extraordinary circumstances from "the protracted separation of mother from child, combined with the mother's lack of an established household of her own, her unwed state, and the attachment of the child to the custodian." In *Matter of Jonathan D.* (62 AD2d 947), extraordinary circumstances were found to exist in the case of a nine-year-old boy who had spent six and one half of these years in a foster home. In *Matter of Tyrrell v Tyrrell* (67 AD2d 247), a majority of the court found that although the noncustodial natural

parent acquiesced in custody being placed with the child's father upon divorce, she had maintained a close and continuing relationship with the child which barred a finding of extraordinary circumstances. Thus, her right to custody of the child was superior to that of the stepmother, who had married the child's now deceased father, a union which itself produced a child.

The critical issue in the cases cited herein seems to be the nature and quality of the disruption of custody. Application of this test to the case at hand requires some brief observations. This is not a case involving surrender, abandonment or persistent neglect. I agree with the court below that the competing parties are both fit persons to whom custody could be granted. While the disruption of custody here was both unfortunate and involuntary, the fact remains that under the circumstances which prevailed when custody was first disrupted, the record does not demonstrate any serious intention on petitioner's part to pursue parental responsibilities. This is somewhat bolstered by the hiatus of some eight months between the initial separation of Valentina's parents and petitioner's efforts to contact his family. While this does not necessarily establish any intent to surrender custody, it is a factor which must be considered in determining whether extraordinary circumstances exist. There is the further fact that at the time petitioner acquiesced in placing custody with Linda, petitioner was aware of her terminal illness and yet does not appear to have made any contingency plans vis-à-vis custody of Valentina. Again, this observation is made solely to determine whether extraordinary circumstances exist. Obviously time and space reduced much of petitioner's ability to involve himself with Valentina and he commenced the instant proceeding shortly after learning of Linda's death. While perhaps petitioner cannot be faulted for failing to visit or keep in closer contact with his child a continent away, that very fact is a strong if not compelling indication that the circumstances surrounding this case take it out of the ordinary. That these circumstances were beyond petitioner's control does not serve to defeat a finding of extraordinary circumstances (see *Raysor v Gabbey, supra). The confluence of these circumstances have resulted in the separation of Valentina and her father for virtually*

her entire life, albeit a short life. They are strangers sharing a biological relevance to each other. I would conclude, therefore, that the test of extraordinary circumstances has been met. (Cf. *Matter of Gomez v Lozado,* 40 NY2d 839; *Matter of Benitez v Llano,* 39 NY2d 758; *Matter of Wade C. v Rachael D.,* 78 AD2d 937; *Raysor v Gabbey, supra.)*

The record of the trial below contains all the information necessary for consideration of the best interest of the child. Valentina's extended family consists of her aunt, Joann Morreale, who seeks custody, and her maternal grandparents. This is the only family she has ever known besides her mother. At the request of the Surrogate, an investigation of the Morreale family and home was made by the Catholic Family Center of the Diocese of Rochester. A reading of the report indicates that Joann Morreale, the prospective custodian of Valentina, is a school teacher, is unmarried and lives with her parents, Norman and Katherine Morreale, as does the child. Joann Morreale appears to be a fit and proper person in whom custody could be entrusted. Both elder Morreales are educators (Norman Morreale is now retired) and have comfortable incomes. The home in which they live is in a residential area of Rochester and appears to be in all ways appropriate for the raising of a youngster.

The Surrogate appointed one Dr. David Miller, a psychiatrist, who interviewed and evaluated all of the parties concerned in this proceeding. His report, which the Surrogate seems to ignore or minimize, concludes that to separate Valentina from her extended family at this time, and to move her "into a strange environment with a strange language would be devastating to her psychological development." At the trial he further testified, *inter alia,* that to separate the child from the only family she knows at this time would be "a psychological disaster" and that he would expect to see, as a result of such a separation, "tremendous regression in this child, probably wetting the bed, abandoning her toilet training habits, speech regression, signs of depression."

On his behalf petitioner retained one Mark H. Lewis, Ph.D., a psychologist who, through an interpreter, inter-

viewed petitioner and submitted a report to the court. This report chiefly concerned itself with petitioner, a native of Florence, Italy, and concluded that Marco Milli is "a pleasant, well meaning thirty-three year old who is free of any significant emotional problems", fully capable of raising his daughter. While he did not interview Valentina, his report states, "[a]t this age she should be able to make an adjustment to a new primary family, a new culture and a new language with minimal upset * * * Without evaluating her [Valentina] and her maternal grandparents, however, I am unable to make any judgment about which setting (father's or granparents' [sic] will be more conducive to Valentina's personal, social, and academic growth and development." He testified at the trial, much to the same effect.

At the request of the Surrogate, one Carmen Viglucci, a Rochester journalist, while in Italy, visited Marco Milli's place of residence, interviewed his family, friends, etc. In his report to the court he offered the conclusion that petitioner loves his daughter, would provide a loving and adequate home for her and "could find no good reason why his daughter should not be returned to him."

The court-appointed guardian ad litem, one Anthony C. Noto, an attorney, submitted a report to the Surrogate. In his report he reviewed the factual background of the case and the applicable law. He concluded that the facts, as elicited at trial, fail to demonstrate petitioner's unfitness, persisting neglect, surrender or abandonment (not at issue in this case). He further observed that if neglect were present at all, it was neglect visited upon petitioner by his former wife and her parents. The only extraordinary circumstance which exists in the case, according to the guardian ad litem, is the fact that Valentina was born in Florence, Italy, where she resided for five months and has been raised since then in the American culture. In addressing the question of the best interest of the child, he cited petitioner's three trips to Rochester, "exposing himself to our judicial system, overcoming obstacles to visit with her and conducting himself as a law abiding citizen in not disturbing the peace or violating the law in his attempts to visit and gain custody." Indeed, this report appears to

address the best interest of petitioner rather than the child.

Considering all the relevant matters contained in the record, I would conclude that extraordinary circumstances exist in this case and that it would be in the best interests of the infant herein that her custody be the responsibility of Joann Morreale, and that she should continue to reside with said custodian and the other members of her extended family, subject to petitioner's rights to visitation.

HANCOCK, JR., J. P., CALLAHAN, DENMAN and SCHNEPP, JJ., concur; DOERR, J., dissents and votes to reverse the order and deny the petition.

Order affirmed, without costs.