OPINION OF THE COURT
Edward M. Horey, S.
The proceeding before the court is the return on a petition seeking the appointment of a guardian of the person and property of two infants. The petitioner, Ann Paschen, is the stepmother of the children. The respondent, Suzan Paschen, is the natural mother of the children.
An attorney guardian ad litem, one Teddar Brooks, Esq., was appointed by the court to represent the interests of the infants, Jeffrey William Paschen and Brian Carl Paschen. A full trial was had before the court.
A psychiatric-psychological examination was ordered by the court. An in-depth probation report was also ordered by the court. Both reports were received in evidence.
Turning first to the law applicable to the instant case, this court concedes doubt.
*422 In Matter of Bennett v Jeffreys (40 NY2d 543), our Court of Appeals, in a broad-ranging review of precedent, held that a two-tier test was applicable to a proceeding in the Family Court in which an unwed mother sought to obtain custody of her daughter from a custodian to whom the child had been voluntarily, although not formally, entrusted by the mother’s parents when the mother was only 15 years old.
It is important to note that in Bennett v Jeffreys (supra, p 545), the court expressly noted that: “no statute is directly applicable, and the analysis must proceed from common-law principles”.
It was in determining that nonstatutory proceeding that the court announced (supra, p 549) the application of its two-tier test for custody as follows: “To recapitulate: intervention by the State in the right and responsibility of a natural parent to custody of her or his child is warranted if there is first a judicial finding of surrender, abandonment, unfitness, persistent neglect, unfortunate or involuntary extended disruption of custody, or other equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child”.
In construing the test established in Bennett v Jeffreys (supra), both the majority and dissenting Justices of the Fourth Department, Appellate Division, in Milli v Morreale (83 AD2d 173, 175) were agreed that before a Surrogate’s Court could proceed to award custody based on the best interest of the child involved, the court must first make a threshold determination that one or more of the extraordinary circumstances set forth in Bennett v Jeffreys exists.
It is important to note that no statute authorizing the proceeding which led to the determination in Milli v Morreale (supra) is mentioned in either the Per Curiam opinion of the majority or the dissent of Justice Doerr. All that appears concerning the nature of the proceeding is in the factual recounting in the dissent. There, it is recited that the decedent mother was awarded custody of a female child named Valentina in a divorce action from a husband who remained in Italy. By her will the decedent nominated her sister as guardian of the person of the infant. Upon appli *423 cation of the decedent’s sister, the Surrogate appointed her guardian of the person of the infant. The father of the infant returned from Italy and "instituted the present proceedings in which the parties agreed that the court would determine their relative custodial rights to Valentina”. (83 AD2d 173, 174, supra; italics added.)
What kind of proceeding was brought in Milli v Morreale (supra) is baffling. If the proceeding was not one under common law, or was not a submission for judicial decision upon consent of the parties, then it would appear to be one for the revocation of letters of guardianship previously issued in the Surrogate’s Court. The only statutory authorization for that type of proceeding under the Surrogate’s Court Procedure Act is subdivision 1 of section 1722. There, it is provided in relevant part that: “[w]here the court has reason to believe that sufficient cause exists for the guardian’s removal, it may appoint a guardian ad litem for the infant for the purpose of filing a petition * * * for the removal of the guardian and prosecuting the proceeding for that purpose”. (Italics added.) While nothing is stated in the decision, the identity of the appearing parties recited at the head of the decision indicates that a Law Guardian was appointed. However, it appears that the petition was brought by the natural father and not the Law Guardian.
What we have then in Milli v Morreale (supra) is a . proceeding brought either under some general common-law principle without statutory basis, or one brought upon consent of the parties for a judicial determination, also without statutory basis, or one brought for revocation of guardianship under a statute, viz., SCPA 1722 (subd 1). If it is the last possibility the applicable statute leaves the determination to rest solely upon what the trial court has reason to believe is sufficient cause for the guardian’s removal. Clearly, the determination is to rest on the subjective review of the Surrogate. Because of the absence of any legislatively stated standard in SCPA 1722 (subd 1), such as what serves the best interest of the infant or what will promote the interest of the infant, it is understandable that the common-law, two-tiered test established in Bennett v Jeffreys (supra) was applied. No quarrel is made of the Milli v Morreale decision if such decision is viewed as *424 one made in the absence of any legislatively determined standard.
Without further belaboring the matter, the point is made that the proceedings in Milli v Morreale (supra) were instituted either without statutory authority, or with statutory authority, but in any instance they were not instituted under a statute which gave any legislatively determined test, direction or basis for judicial decision.
In contrast, the proceeding here is for the appointment of a guardian of the person and property of two infants. It has a fixed statutory basis. SCPA 1701 expressly authorizes a Surrogate’s Court to appoint “a guardian of the person or of the property or of both of an infant whether or not the parent or parents of the infant are living”. (Italics added.) More importantly, SCPA 1707 sets forth the test established by the Legislature for making such appointments. SCPA 1707 (subd 1) expressly provides: “If the court be satisfied that the interests of the infant will be promoted by the appointment of a guardian of his person or of his property, or of both, it must make a decree accordingly”. (Italics added.) There is thus applicable a statutory standard.
The importance of the point of whether a proceeding is made under a statute containing a legislatively determined test lies in the exceptions to the two-tier rule announced in Bennett v Jeffreys (supra). In that case, the Court of Appeals pointedly contrasted • (pp 547-548) the decision there made concerning custodial rights made under common-law principles which were there applied, from decisions to be made under statutes that require courts to determine custody on other and different bases that have been legislatively set forth in statutes: “Recently enacted statute law, applicable to related areas of child custody such as adoption and permanent neglect proceedings, has explicitly required the courts to base custody decisions solely upon the best interest of the child (Social Services Law, § 383, subd 5; Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]; Family Ct Act, § 614, subd 1, par [e]; § 631; see Matter of Anonymous [St. Christopher’s Home), 40 NY2d 96, supra; Matter of Orlando F., 40 NY2d 103, supra; Matter of Ray A. M., 37 NY2d 619, 621, supra; cf. Lo Presti *425 v Lo Presti, 40 NY2d 522). Under these statutes, there is no presumption that the best interest of the child will be promoted by any particular custodial disposition. Only to this limited extent is there a departure from the preexisting decisional rule, which never gave more than rebuttal presumptive status, however strongly, to the parent’s ‘right’ ”.
The legislative basis for determination of custody in those statutes mentioned by the Court of Appeals is statutes “such as” a proceeding brought under subdivision 5 of section 383 of the Social Services Law relative to the surrender of a child for adoption. There, it is stated: “[t]he custody of such child shall be awarded solely on the basis of the best interests of the child”. Similarly, in a proceeding brought to revoke consent to an adoption instituted under section 115 of the Domestic Relations Law, cited as an example by the Court of Appeals, it is provided: “[Cjustody of such child shall be awarded solely on the basis of the best interests of the child” (Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]). Also cited as an example of statutory exception was a proceeding brought under section 614 of the Family Court Act, to permanently terminate parents’ custody. There, the requirements are allegation and proof that “the best interests of the child require that” the parents, or other custodian’s custody of the child be terminated permanently. (Family Ct Act, § 614, subd 1, par [e].)
In the case at bar, there is also a legislatively determined standard. As noted, SCPA 1707 (subd 1) provides “If the court be satisfied that the interests of the infant will be promoted by the appointment of a guardian * * * [the court] must make a decree accordingly”. (Italics added.)
Sed quaere? Is or is not the statute in effect, viz., SCPA 1707 (subd 1) to be equated with the exampled statutes noted by the Court of Appeals as exceptions to its posited rule that a threshold determination must be first made that special circumstances exist to override the “presumptive status” of a parent’s right to custody before the best interests of the child can be considered?
This court is placed on the horns of a dilemma by the generality and positiveness of the determination in Milli v Morreale (supra, p 173) that it is settled that “‘[b]efore *426 custody may be awarded to a nonparent based on the best interest of the child against the wishes of a parent, the court must make the threshold determination that extraordinary circumstances exist’
In the opinion of this court, despite the all inclusiveness of the rule held in Milli v Morreale (supra) the same would not have application without exception in every contest between a parent and a nonparent over the issue of custody of a minor. This is for the reason that a contest between such parties is possible under the statutory exceptions noted by the Court of Appeals in Bennett v Jeffreys (supra). Certainly as to proceedings under these statutes noted and conceded by the Court of Appeals to be exceptions, the legislatively determined standard in these statutes should be applied. This court is of the further opinion that the excepted treatment should similarly be accorded SCPA 1707 (subd 1), the statute here in issue. In addition to the existence of a statute with a standard (SCPA 1707), the basis of this opinion is decisional law.
In Matter of Stuart (280 NY 245), the Court of Appeals had before it a proceeding for the appointment of a nonparent as guardian. The proceeding had been initiated in the Surrogate’s Court and it was brought under the provisions of sections 173 and 179 of the Surrogate’s Court Act, which sections respectively were the predecessors to SCPA 1701 and 1707 here in issue. The statutory test for appointment of a guardian then, as now, was that the Surrogate be satisfied that the interest of the infant would be promoted. Then, as now, the statute expressly authorized the appointment of a person other than a parent. (See 280 NY 245, 250, supra.) After a hearing the Surrogate of Nassau County appointed the petitioning nonparent as guardian of the person. The Appellate Division, Second Department, reversed the determination. (See Matter of Stuart, 255 App Div 811.) The Court of Appeals in turn reversed the Appellate Division and reinstated the determination of the Surrogate. (See 280 NY 245, supra.)
In reversing the Appellate Division, the Court of Appeals stated (supra, p 249): “It appears from the memorandum of the Appellate Division that the modification was made upon the theory that the law is that in the absence of *427 proof showing that a surviving parent is of bad character or otherwise unfit to have the custody of his minor child, his right to custody is paramount to that of any stranger or other relative”. It is difficult to distinguish the quoted view from that of the Appellate Division, Fourth Department, in Milli v Morreale (83 AD2d 173, supra), and in Matter of Tyrrell v Tyrrell (67 AD2d 247, affd 47 NY2d 937). Nonetheless, the Court of Appeals stated that the basis cited by the Appellate Division for its view, viz., then section 81 of the Domestic Relations Law and decisions referable to the appointment of guardians for children of tender years was inapplicable.
The express holding by the Court of Appeals in Matter of Stuart (280 NY, at p 250, supra) after noting the applicable statutes of the Surrogate’s Court Act was as follows: “In all cases involving the appointment of a guardian for an infant the paramount question is whether the interest of the infant will be promoted by the appointment to be made. The decisions are uniform in so deciding, even in cases where the infant was under fourteen years of age. (Matter of Gustow, 220 N. Y. 373.)” (Italics added.) The court added that broad discretion was granted the Surrogate in making the statutory determination and it should not be lightly set aside.
The decision in Matter of Stuart (supra) has not been overruled, at least expressly. The case was not cited in Matter of Bennett v Jeffreys (supra) either as an earlier decision in conflict with the new two-tiered rule announced in that case. However, Matter of Stuart was cited as late as January, 1979, with approval and as the basis of a reversal, by the Appellate Division, First Department, of a decision by the Surrogate’s Court of Bronx County. “SCPA 1701 and 1707 authorize and empower the Surrogate to appoint a guardian of the person or property of an infant, including a person other than the parents of the infant and whether or not the parent is living, upon a finding that the best interests of the infant will be promoted by such appointment. (See Matter of Stuart, 280 NY 245; Matter of Morgan, 70 Misc 2d 1063; Matter of Rugovac, 77 Misc 2d 659.)” (See Matter of Caseres, 67 AD2d 630, 631.)
*428 While this court is of the opinion that SCPA 1707 (subd 1) mandating, as it does, that the determination of custody by this court be predicated on the stated statutory consideration of what promotes the interest of the infant alone is applicable, the court, nonetheless, recognizes the ramifications which flow from the decision in Milli v Morreale (supra). Read literally, that decision appears to take a contrary view. . It is significant that the decision in Milli v Morreale is a determination of the Appellate Division, Fourth Department. As such, it is binding on this court. For that reason and in the exercise of caution, this court, in addition to applying the statutory test set forth in SCPA 1707, will also apply the test first determined in Bennett v Jeffreys (supra) and stated to be applicable in any contest of custody between a parent and nonparent by the Appellate Division, Fourth Department, in its decision of Milli v Morreale. This necessitates as a threshold issue, the determination of the existence of extraordinary circumstances as defined in Bennett v Jeffreys (supra).
What constitutes “extraordinary circumstances” is not readily determined. The plain truth is that “extraordinary circumstances” are those circumstances which the majority of Judges sitting on the highest appellate court that reviews a particular case in issue finds sufficiently persuasive to order retention or change of custodial rights. (See, e.g., Matter of Bennett v Jeffreys, 40 NY2d 543, wherein the trial court was reversed by the Appellate Division, Second Department, and that court, in turn, reversed by the Court of Appeals.)
Charting a course through the examples established by decisional law is as challenging to a lower court Judge as negotiating safe passage through the Siegfried Line. Known judicial mine fields abound. Precedential tank traps are at hand. More important, however, are the hidden artillery emplacements of particular judicial preferences and the camouflaged machine gun nests of peculiar judicial aversions. They are ever present. They can destroy the best plotted and most carefully selected route by the Trial Judge. (See, e.g., Matter of Tyrrell v Tyrrell, 67 AD2d 247, affd 47 NY2d 937, supra, a 3 to 2 reversal of the trial court’s determination; cf. Milli v Morreale, 83 AD2d 173, *429 supra, a 4 to 1 affirmance of the trial court’s determination by the same appellate court, but with decision by different Judges sitting.)
An accurate summary of the varying considerations emphasized by particular Appellate Judges is set forth in Milli v Morreale (83 AD2d 173, supra). There, it was stated (pp 175-176 [Doerr, J., dissenting]): “In Raysor v Gabbey (57 AD2d 437, 441), extraordinary circumstances were found to exist because of the child’s mixed racial background and her lifelong separation from her father even though ‘the separation of father and daughter was involuntary on his part and * * * he has attempted, within his means, to maintain a parental relationship with his daughter, even at long range (see Matter of Bennett v Jeffreys, supra, p 548; cf. People ex rel. Gallinger v Gallinger, 55 AD2d 1036)’. Indeed, in Matter of Bennett v Jeffreys (supra, p 550), the court found extraordinary circumstances from ‘the protracted separation of mother from child, combined with the mother’s lack of an established household of her own, her unwed state, and the attachment of the child to the custodian.’ In Matter of Jonathan D. (62 AD2d 947), extraordinary circumstances were found to exist in the case of a nine-year-old boy who had spent six and one half of these years in a foster home. In Matter of Tyrrell v Tyrrell (67 AD2d 247), a majority of the court found that although the noncustodial natural parent acquiesced in custody being placed with the child’s father upon divorce, she had maintained a close and continuing relationship with the child which barred a finding of extraordinary circumstances. Thus, her right to custody of the child was superior to that of the stepmother, who had married the child’s now deceased father, a union which itself produced a child”.
As has been observed, the critical issue in a case such as the one for decision appears to be the nature and quality of the disruption of custody. (See Milli v Morreale, 83 AD2d 173, 176, supra.) As previously indicated, the nature and quality of disruption varies in the eye of the judicial beholder.
As this court views the instant case, it is of the opinion that it falls within the exceptions noted in Matter of Ben *430 nett v Jeffreys (40 NY2d 543, supra). Specifically, the court first finds that the conduct of the natural mother was either a “surrender” within the meaning of that term as employed in Bennett v Jeffreys (supra, p 549) or if not a “surrender” at least “[an] equivalent but rare extraordinary circumstance which would drastically affect the welfare of the child”, all within the meaning of that phrase as employed in the same case.
Certain it is that the natural mother did at one time surrender the children. She did this in California after having been awarded custody of the children by an appropriate California court. However, the surrender which she made voluntarily was to her former husband and not to the petitioning second wife here involved. There is nothing contained in the decision in Bennett v Jeffreys (supra) which provides that a “surrender” be made to the particular party competing for custodial rights. The ordinary meaning of “surrender” has no such requirement. The word is defined to mean “to give up possession of or power over; yield to another on demand or compulsion”. (Webster’s New World Dictionary [college ed].)
Viewing the conditions collectively stated in Bennett v Jeffreys (supra), which must be found to exist before considerations of the best interests of the children can be addressed, it appears they all relate to conduct indicative of a forfeiture of parental rights. So viewed, the “surrender” of the children, regardless of the person to whom surrendered, is indicative of a forfeiture of parental rights. This appears to be especially true in the circumstances which prevail in the instant case. Here, the mother’s surrender came voluntarily after she had litigated the issue of custody with her former husband and had been successful in that litigation.
The mother protests now that she was motivated in making such surrender of the children by a desire that the children be able to continue to reside in the family homestead. This court puts no credence in this assertion.
Even under the mother’s version of the facts, what occurred was that after she secured a divorce with provisions for receipt of support payments of $160 a month and *431 an accompanying adjudication of custody of the children, together with possession of the family residence, her husband stopped his previous co-operation. He “brought” the wife “back to court to make [her] sell the house”. Despite the advice of her attorney that her husband would not be successful in his efforts and that no sale of the house would be judicially required, at least until the divorce became final months later, the mother, nonetheless, voluntarily surrendered the children to her former husband and moved out of the family residence leaving the children there to live with the father who then moved in.
There is no evidence that the bank or other mortgagee was threatening foreclosure. There is no evidence that the former husband had reneged on the ordered support payments. In fact, the evidence is that he was employed and he was making the ordered payments. There is no evidence that the support payments, coupled with the mother’s income were not sufficient to meet the mortgage payments to retain the house. At worst, the expenses of the house caused a strain on her financial posture. Most important is the absence of evidence or even an assertion that the action of her former husband in his efforts to force a sale of the house was a ploy or device to secure custody of the children.
An abbreviated summary of the factual findings of the court and the evidence supportive of the same is hereinafter set forth in the interest of brevity.
Respondent mother voluntarily surrendered the children to her husband in California after having been awarded custody of them by a California court. Her motivation in making such surrender was her desire to effect an easy intimate and immediate relationship with her paramour without the disturbing presence of children to interfere with the anticipated idyllic liaison.
The record indicates the mother’s romantic venture with her paramour has continued unabated, if not unsatiated. The subject of marriage “just hadn’t come up”. She has lived continuously with him since 1978. She admitted at the trial that she had no prospects of marriage.
The respondent mother frequently imbibes heavily in alcoholic beverages and she is a habituae of bars and taverns. The testimony of independent witnesses estab *432 lishes that she frequently left the children unattended while going to various bars for periods of three to four hours or more.
Respondent mother, on occasion, failed to exercise reasonable parental care for the physical well-being of the children. Supportive of this determination is testimony that on one occasion during the exercise of visitation rights in California, she demonstrated her preference for an uninterrupted evening in bed with her paramour over attending to the physical injuries of her children by hanging a “Do Not Disturb” sign on her bedroom door and refusing to respond to advice that one of the boys had injured himself in the bathroom.
After the surrender of the children to her husband in March, 1978, and continuing thereafter while her husband and children were in California, until the latter part of October, 1978, the visitation by the mother respondent of the children was infrequent and sporadic.
After the departure of her former husband and children from California to New York in late October, 1978, and continuing until his death on March 12, 1981, the respondent mother’s visits with the children were less frequent and more sporadic than previously.
The sole visitation by the mother with the children after their return to New York occurred in the summer of 1980. At that time the mother respondent returned with her mother to New York and remained for a one-week period at a motel in Olean, New York.
There is a question of whether the mother has an established household of her own. According to the evidence at trial, she shared an apartment with her paramour. The mother conceded that the apartment was not sufficiently large enough to accommodate the two boys. There is also a question that the children might be prohibited under the terms of the lease of that apartment.
The physical separation of the children from the mother respondent has existed for over three years and six months. In the life of Jeffrey, the separation has existed from the time he was seven and one half years and has continued through his eleventh year. In the life of Brian, the separa *433 tion existed from the time he was six and one half years of age and has continued through his tenth year. In the opinion of the court, these were significant and formulative years in the lives of these two boys. Attachments were made to environment and people. Life-styles and values were being formed.
The separation of the children from their stepmother petitioner now would “create for both boys a significant emotional upheaval and face them with difficult psychological adjustments”. This is the finding of the court. It was the precise conclusion of the clinical psychologist, Ted Miller. The psychologist’s conclusions were concurred in by Dr. Raquib Raja, the county psychiatrist under whose supervision the examination was conducted and the report of the psychologist was made. It was also the opinion of Teddar Brooks, Esq., the attorney guardian ad litem who was appointed by this court to represent the boys.
The children strongly desire to remain with their stepmother. That was their positive expression upon trial in October, 1981. It continues to be their desire according to the recent report of the clinical psychologist forwarded to the court by letter dated July 9, 1982.
The environment in rural Little Valley, New York, has proven beneficial to the two boys. They have adapted completely to their surroundings. Each has shown marked improvement in school work. A veritable host of letters from school teachers, minister, coaches, nurses, relatives, neighbors and acquaintances, attached and made a part of the report of the Cattaraugus County Probation Department testify to the continuing improvement of both boys physically and emotionally.
With the exception of a maternal grandmother, who resides in California, and is a loving grandparent, all other relatives of the two boys live in and about the boys’ residence in Little Valley, New York. There are several of these relatives. The boys have an ongoing relationship with these paternal relatives.
There has developed a deep and mutual love and affection between the boys and their stepmother. Yet her love has not overcome her innate common sense and good *434 judgment. She maintains a fair and even discipline of the boys. She interests herself in their school and athletic endeavors. She insists on cleanliness and neatness in their personal appearance, as well as in their rooms. She is diligent in seeing to the children’s continued attendance at the Lutheran Church, although she is a Catholic. Simply stated, Ann Paschen, as a 32-year-old widow, comely and robust in appearance and quiet, but firm, in personality has dedicated herself to the proper upbringing of these two boys.
The children are adequately provided for financially at their present residence with the petitioning stepmother. They receive Social Security benefits of approximately $680 per month. The petitioning stepmother also receives an additional $120 per month from Social Security. The stepmother is employed in a delicatessan department of a supermarket and earns approximately $80 per week. The combination of Social Security benefits and salary approximate $1,100 of monthly income. Petitioner, as surviving spouse of the boys’ father received a total of $28,000 life insurance proceeds. She expended approximately $10,000 to pay medical expenses of her husband; his funeral expenses; purchase of an automobile and some home improvements. Additionally, she has expended some $4,000 of Social Security proceeds for home improvements. Her house is modest, but with adequate rooms to accommodate her and the two boys. The house is paid in full. She has made up a budget and appears to be operating successfully within its limits. She has managed to return, through savings, approximately $3,000 of the $10,000 earlier expended.
In contrast, the evidence on trial was that the mother had no savings; owned no home; was indebted for legal fees and required all of her income to maintain her in the style of living to which she had become accustomed. With an admitted large increase in cost to obtain a house or apartment to accommodate the boys, there is a substantial question if the mother would have sufficient funds available if the boys were returned to her.

Abbreviated summary of factual findings ends.

*435 Predicated on all of the foregoing, this court reaches the conclusion that the best interests of the infants will be promoted by the appointment of the petitioner, Ann Paschen, as guardian of the person and property of the infants, Jeffrey William Paschen and Brian Carl Paschen.
Essentially, in the court’s opinion, the problem of the respondent mother lies in self-indulgence. When' confronted with the choice of accepting the onus of being a parent or enjoying an evening at the bar, she regularly chose the latter. When faced with the difficulties of entertaining a paramour with her children present, she chose to give up the children to solve the problem.
On the parade ground of parenthood, she marches to a different drummer than what, in the opinion of this court, a mother with commonly accepted standards does. It is conceded on this issue that the court’s judgment may be more provincial and less attuned to a more modern way of living than that found acceptable by reviewing courts or Judges. We are all the beneficiaries, or victims, of our individual backgrounds. What is not conceded is what will best advance the welfare of the infants in question. On that score, the court is convinced that it is continuance of the children in the care and custody of the petitioning stepmother.
While the record does not support the candidacy of the respondent for a “mother of the year award”, this court, nonetheless, recognizes there does exist in her a repository of genuine affection for her sons. An opportunity to express such affection should be provided. Accordingly, but in no way in diminution of the care, custody and control of the infants granted to the petitioner under her appointment as guardian of the person of such infants (see 3B Warren’s Heaton, Surrogate’s Courts, § 320, par 2 [a], and cases cited), the court authorizes the following periods of visitation to be accorded the respondent mother, Suzan Paschen, to wit: A period of four consecutive weeks during the summer school vacation period, together with one week during the Christmas recess period and an additional one week during the Easter or spring school recess period. Such visitation shall be exercised by the mother within the State of New York, or at her residence in the State of California, *436 provided always that she posts such bond, or makes such other arrangements for the safe return of the children to their guardian, as to this court, upon petition by the guardian, or the natural mother are deemed fair and reasonable. The cost and expense attending the exercise of the visitation rights herein granted shall be borne by the respondent mother, Suzan Paschen.